**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **Philip McFadden and John P. DeFranza,** : <br> **individually and on behalf of all others** : <br> **similarly situated,** : <br> : <br> **Plaintiffs,** : <br> : <br> **vs.** : <br> : <br> **Fenix Internet, LLC** : <br> 2598 E. Sunrise Blvd, Suite 2104 : <br> Fort Lauderdale, FL 33304, : <br> : <br> **and** : <br> : <br> **Fenix International Limited** : <br> Fourth Floor, Imperial House : <br> 8 Kean Street : <br> London WC2B 4AS : <br> United Kingdom, : <br> : <br> : <br> **Defendants.** : | Case No.  1:23-cv-06151 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Phillip McFadden and John P. DeFranza, ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Fenix International Limited ("OnlyFans") and Fenix Internet, LLC (collectively, "Defendants"), and allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief.

## INTRODUCTION

1.      Founded in 2016, OnlyFans runs a subscription-based social media platform that has grown exponentially in recent years. OnlyFans claims that it is centered around "authentic relationships," and sets itself apart from other social media platforms and content-based websites

on this basis. In stating its mission, for example, OnlyFans has touted itself as "the social platform revolutionizing creator and fan connections," and claims that it "allows [artists and content creators] to monetize their content while developing authentic relationships with their fanbase."[1]

2.      To further this mission, OnlyFans invites users to create an OnlyFans account, subscribe to creators' accounts, and pay to access exclusive content through those subscriptions, including paying to directly message ("DM") with creators.

3.      OnlyFans, whose popularity has mushroomed since 2020, recently claimed to have 150 million registered users and to pay out over $5 billion dollars annually to its content creators.[2] While the site's growth and reputation has been fueled largely by its adult content, OnlyFans also hosts, and profits from, a variety of creators and their content.

4.      Since launching, OnlyFans has earned a reputation as a reliable source of income for many of its 1.5 million creators who choose OnlyFans as the venue to monetize their content, particularly for women – ranging from supplemental income to highly lucrative income, depending on the creator's output and popularity.

5.      OnlyFans retains 20% of the revenue that fans pay to access creators' content, including payments for subscriptions, exclusive content, and monetary tips sent by users in order to access direct messages or other content.[3] OnlyFans's revenue is directly proportional to the volume of creator-specific subscriptions and exclusive content that users purchase.

6.      Unbeknownst to fans, though, many of the interactions that they pay to have on OnlyFans with some of the top revenue producing creators are not "authentic" at all.

---

[1]  ONLYFANS, *Our Team and Goals* (May 15, 2023), https://onlyfans.com/about [https://web.archive.org/web/20230515105720/https://onlyfans.com/about.html].
[2]  *Id.*
[3]  ONLYFANS, *Help: Payout Percentages*, https://onlyfans.com/help/3/16/59 (last visited July 24, 2023).

7.     Instead, as has recently come to light, many of the highest-earning creators deceptively outsource the job of interacting with users to third-party agencies and/or management companies.

8.     According to "[i]ndustry insiders," "OnlyFans-focused management companies" sometimes "hire account managers to pretend to be the models — including when sexting fans."[4] For instance, the Unruly Agency "has a hidden army of 'account managers' who spend much of their days ghostwriting responses to messages that fans pay to send some influencers."[5] Two "former Unruly staffers allege[d] that fans divulge their 'deepest and innermost personal secrets including sexual fantasies and fetishes' thinking they are chatting with the influencers."[6]

9.     Thus, while OnlyFans promises on its website that "[s]ubscribing to a Creator gives you . . . access to be able to communicate with them directly via the direct messages interface (DM),"[7] many users who pay to receive personal messages from creators in fact receive messages from third-party companies – strangers – *posing* as the Creators.

10.     It is hereby believed and therefore averred that OnlyFans knows about these arrangements between creators and third-party companies.

11.     Instead of curtailing these practices, OnlyFans facilitates the continued deception of the fans that use its site. Not only are fans harmed by this deception, but creators are, too. Since OnlyFans holds its platform out as a place for authentic relationships, those creators that do in fact use the platform as promised face a potential harm as fans may begin to shy away from the site as

---

[4] Amanda Perelli, *The Secret Lives of OnlyFans Ghostwriters, Who Say Their Job Includes Catfishing Paying Fans*, BUSINESS INSIDER (Jan. 4, 2023), https://www.businessinsider.com/inside-secret-lives-onlyfans-ghostwriters-catfish-fans-2021-12
[5] *Id.*
[6] *Id.*
[7] ONLYFANS, *Help: Why Subscribe?*, https://onlyfans.com/help/2/12/104 (last visited July 24, 2023).

the practice becomes better known, uncertain as to whether, on OnlyFans, they are actually able to engage in the authentic communications they contracted to receive.

12.     Meanwhile, OnlyFans knows or has reason to know that its highest-earning creators engage third-party companies to interact with fans, but deceptively continues to hold itself out to users as a platform for building "authentic relationships," duping users into believing that they are interacting with the creators themselves. As one creator put it, "My fans aren't paying for porn. They're paying to have a personal experience, one-on-one[.]"[8]

13.     OnlyFans profits from these deceptive arrangements with third-party companies by promoting direct messages, pay-per-view messages, and the "tip" feature it makes available on its platform, and taking its 20% cut. It induces users to pay for creators' exclusive content by selling the illusion of intimacy and the false promise that the actual creator may become aware of and be interested in the actual fan.

14.     As OnlyFans previously explained to creators on its website, "[t]he more you interact with your fans on a personal level through messaging, the more likely they are to show their appreciation by tipping you."[9] Indeed, OnlyFans explained that "[y]ou may be surprised at how many fans will pay just to interact with you."[10]

15.     Similarly, as to pay-per-view ("PPV") content, OnlyFans previously explained: "A paid message contains content hidden behind a paywall that your fans pay to unlock. This feature

---

[8] Sirin Kale, *OnlyFans: a day in the life of a top(less) creator*, THE ECONOMIST: 1843 MAGAZINE (Jan. 6, 2020), https://www.1843magazine.com/people/onlyfans-a-day-in-the-life-of-a-topless-creator (last visited Feb. 22, 2023) (internal quotation marks omitted).
[9] ONLYFANS, *Using Messages on OnlyFans* (Apr. 22, 2022), https://blog.onlyfans.com/using-messages-on-onlyfans/.
[https://web.archive.org/web/20220422181918/https://blog.onlyfans.com/using-messages-on-onlyfans/]
[10] *Id.*

is one of the most popular ways to make money on OnlyFans and is available for all accounts on the platform – free or paid."[11]

16.     OnlyFans instructs creators to sell the illusion of intimacy. For example, in an article on its website directed to creators about how to maximize PPV earnings, OnlyFans previously explained: "As long as your fans feel like you're offering a sincere invitation to connect with you and your most exclusive content over PPV, they'll feel your PPVs were money well spent."[12]

17.     OnlyFans further promotes the illusion of intimacy through select creators it features on its website. For example, one creator featured on the OnlyFans blog explained: "[t]he best part is connecting with people from all over the world on a more intimate level, rather than just commenting on an Instagram post."[13]

18.     Another creator that OnlyFans featured similarly explained, "OnlyFans has given me the ability to really get to know my fans one on one. I chat with them every day, and it's something I truly enjoy."[14] As another creator puts it "The fans are what makes this platform go round and I love that I can engage and connect with my fans. We all crave human connection and I think it's important to interact with each other."[15]

---

[11] *Id.*

[12] ONLYFANS, *How to Use PPVs Like a Pro* (Apr. 22, 2022), https://blog.onlyfans.com/using-messages-on-onlyfans
[https://web.archive.org/web/20221002061728/https://blog.onlyfans.com/how-to-use-ppvs-like-a-pro/].

[13] ONLYFANS, *There's More to Harry Jowsey* (Dec. 19, 2022), https://blog.onlyfans.com/theres-more-to-harry-jowsey/ (last visited July 24, 2023).

[14] ONLYFANS, *How Sophie Kasaei Approaches OnlyFans* (Mar. 20, 2023), https://blog.onlyfans.com/sophie-kasaei-approaches-onlyfans/.

[15] ONLYFANS, *Jamie Colleen Miller is Unstoppable* (Mar. 1, 2023), https://blog.onlyfans.com/jamie-colleen-miller/.

19.     OnlyFans promotes the idea of direct communication and relationships beyond the adult themed content. As yet another featured creator puts it: "the way that OnlyFans brings fans and athletes closer together is amazing too."[16]

20.     Despite this, when it comes to its highest-earning creators, OnlyFans does not honor its user-facing mission of fostering "authentic relationships" in practice. Instead, it continues to promote itself as a platform for direct relationships between creators and users while simultaneously facilitating and profiting from the deception of its customers through third-party companies posing as creators.

21.     In fact, while the OnlyFans Terms of Service require that creators accurately describe their content,[17] OnlyFans does not enforce this requirement when it comes to the core feature of OnlyFans's site: that it purportedly allows fans to interact directly with the creators that they follow, and not third parties posing as those creators. Indeed, the Terms of Service contain provisions that would allow OnlyFans to withhold creator earnings and return them to fans based on serious or repeat breach of its terms,[18] but OnlyFans chooses not to employ this provision to protect its fans from deceptive conduct.

22.     In sum, though OnlyFans outwardly sells authenticity, and promises its users "very robust content moderation,"[19] behind the curtains it aids its highest-earning creators in defrauding

---

[16]   ONLYFANS, *Stefan Garlicki Finds Freedom on OnlyFans* (Mar. 15, 2023), https://blog.onlyfans.com/stefan-garlicki-finds-freedom/.

[17]   Terms of Service: Terms of Use for Creators, § 9(b)(v)(3), *available at* https://onlyfans.com/terms (last visited July 24, 2023).

[18]   *Id.* § 13(a) (last visited July 24, 2023).

[19]   Raisa Bruner, *OnlyFans CEO Ami Gan Wants to Dispel Misconceptions About the Company*, TIME: THE LEADERSHIP BRIEF (July 31, 2022), https://time.com/6202306/onlyfans-ceo-ami-gan-interview/.

users, amasses significant profits in doing so, and fails to implement any controls against this misconduct. OnlyFans lines its pockets by allowing the misconduct of its most successful creators.

## JURISDICTION

23. This Court has subject matter jurisdiction over this action based on the parties' diversity of citizenship under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action involving more than one hundred (100) putative Class Members, the amount in controversy exceeds $5 million dollars, exclusive of interests and costs, and at least one Class Member is a citizen of a different state than Defendants' state.

24. This Court has personal jurisdiction over Defendants because (i) Defendants regularly conduct business or solicit business, engage in other persistent courses of conduct and/or derive substantial revenue from products and/or services provided to individuals in the District and in this State; and (ii) Defendants have purposefully established substantial, systematic, and continuous contacts with this District and expect or reasonably should expect to be hauled into court here. Thus, Defendants have sufficient minimum contacts with this District, and this Court's exercise of jurisdiction over Defendants will not offend traditional notions of fair play and substantial justice. Exercise of jurisdiction by this Court is just and proper because Defendants, through their business operations, intentionally availed themselves of the markets within this District.

## VENUE

25. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants regularly do business in this District and are subject to personal jurisdiction in this District.

26. Venue is not proper in England or Wales, and English law should not apply, notwithstanding OnlyFans's Terms of Service ("TOS"). The TOS is attached hereto as **Exhibit A**.

27. Plaintiffs' claims arise primarily out of Defendants' misleading, unlawful conduct, alleged herein. In addition, the TOS is an adhesive contract between Plaintiffs and OnlyFans.

28. Plaintiffs had no opportunity to negotiate with OnlyFans regarding its terms. Further, in any negotiation with OnlyFans regarding its terms, Plaintiffs would have had unequal bargaining power because OnlyFans is a wealthy corporate entity with no incentive to amend its terms at Plaintiffs' request.

29. Defendants conduct substantial business in the United States. As discussed below, all OnlyFans transactions are processed by U.S.-based payment processor Fenix Internet. Furthermore, approximately 70% of OnlyFans's revenue originates from U.S. markets. Finally, Plaintiffs bring this case on behalf of U.S.-based individuals only. Thus, Plaintiffs' claims and injuries arise from Defendants' conduct occurring primarily, if not entirely, in the United States.

30. England would not provide an adequate substantive remedy or class action vehicle to vindicate Plaintiffs' claims on behalf of the putative class.

## PARTIES

31. Plaintiff Phillip McFadden ("McFadden") is a natural person and a citizen of the State of Illinois and a resident of DuPage County.

32. Plaintiff John P. DeFranza ("DeFranza") is a natural person and a citizen of the State of New Jersey and a resident of Middlesex County.

33. Plaintiffs each obtained an account on the OnlyFans platform and conducted monetary transactions pursuant to the TOS. *See* **Exhibit A**.

34. Defendant Fenix International Limited (also referred to herein as "OnlyFans") is a Limited Company registered in England whose principal address is Fourth Floor, Imperial House, 8 Kean Street, London WC2B 4AS, United Kingdom.

35.     Defendant Fenix International Limited owns and operates the OnlyFans website.

36.     Defendant Fenix International Limited describes itself as "multifaceted technology company with a focus on staying ahead of the curve."[20]

37.     Defendant Fenix Internet, LLC is a Delaware registered limited liability corporation whose principal address is 2598 E. Sunrise Blvd, Suite 2104, Fort Lauderdale, FL 33304.

38.     Defendant Fenix Internet, LLC has a registered office located at 345 North Canal Street, Chicago, IL 60606.

39.     Defendant Fenix Internet, LLC is a wholly owned subsidiary of Defendant Fenix International Limited.

40.     Defendant Fenix International Limited is the sole member of Defendant Fenix Internet LLC.

41.     Defendant Fenix Internet, LLC also describes itself as a "multifaceted technology company with a focus on staying ahead of the curve."[21]

42.     It is believed and therefore averred that Fenix Internet, LLC conducts and transacts all monetary transactions on the website OnlyFans.com.

43.     For example, it is believed and therefore averred that Fenix Internet LLC processes all payments by users on OnlyFans.com to OnlyFans, and processes all payments from OnlyFans to creators on OnlyFans.com.

44.     All of the transactions made involving Fans and Creators through the OnlyFans website are transacted in U.S. Dollars.

---

[20] FENIX INTERNATIONAL, *Who We Are*, https://fenixinternational.com/ (last visited July 24, 2023).
[21] FENIX INTERNET, *About Us*, http://www.fenixinternet.net/ (last visited July 24, 2023).

## FACTS

**OnlyFans and Fenix Internet do Billions of Dollars' Worth of Business in the U.S.**

45.     OnlyFans has experienced exponential growth since its founding in 2016, fueled by the societal impacts of the COVID-19 pandemic which began in 2020.

46.     On its website, OnlyFans recently claimed to have over 150 million registered users including both individuals who join the site to access content ("Fans") and over 1.5 million content creators ("Creators" or "Content Creators").[22]

47.     A recent report indicates that OnlyFans has over 188 million registered Fans and over 2.1 million Content Creators.[23]

48.     In 2021, OnlyFans Content Creators earned $3.86 billion dollars.[24]

49.     OnlyFans recently claimed to pay out over $5 billion dollars annually to its Content Creators.[25]

50.     Approximately 70 percent of revenue generated by OnlyFans originated from United States markets.[26]

51.     OnlyFans is owned by Leonid Radvinsky who is a resident of the State of Florida.

---

[22] ONLYFANS, *Our Team and Goals*, n.1, *supra.*

[23] Jim Waterson, *OnlyFans Profits Boom as Users Spent $4.8bn on Platform Last Year* (Sept. 1, 2022), THE GUARDIAN: BUSINESS, https://www.theguardian.com/business/2022/sep/01/onlyfans-profits-boom-as-users-spent-48bn-on-platform-last-year.

[24] Todd Spangler, *OnlyFans Creators Earned $3.9 Billion in 2021, Swelling 115% Year Over Year* (Sept. 1, 2022), VARIETY, https://variety.com/2022/digital/news/onlyfans-financials-earnings-creators-1235357264/

[25] ONLYFANS, *Company*, Our *Team and Goals*, n.1, *supra.*

[26] FENIX INTERNATIONAL LIMITED ANNUAL REPORT AND FINANCIAL STATEMENTS FOR THE YEAR ENDED 30 NOV. 2021*, 2* (Nov. 30, 2021), available at https://find-and-update.companyinformation.service.gov.uk/company/10354575/filing-history

52.     Defendant Fenix Internet is wholly owned by and entirely controlled by OnlyFans.[27]

53.     Defendant Fenix Internet, at OnlyFans's direction, collects payments made by Fans from third-party processors and distributes money it collects through other third-party processors to Content Creators.

54.     As the primary conductor of monetary transactions for the OnlyFans website, Fenix Internet directs and sends payments to Content Creators directly to their back accounts, including many United States-based financial institutions.

**OnlyFans Claims to Offer Users Real, Human Connections**

***OnlyFans Invites Users to Create Accounts, Accept its Terms, and Upload a Payment Card to Access the Platform's Unique Features***

55.     To use OnlyFans as a Content Creator or Fan, an individual must register and create an account on www.onlyfans.com.

56.     Before Fans can make any payments on OnlyFans, they must provide Defendant Fenix Internet with their billing information, including the details of their credit card, debit card, or third-party payment account.

57.     As part of the account-creation process, the Content Creator or Fan must agree to OnlyFans's TOS.[28]

58.     The TOS, to which all Fans must indicate their assent, includes Terms of Use for all Users, Terms of Use for Fans, Terms of Use for Creators, Acceptable Use Policy, and Privacy Policy, amongst other policies.[29]

---

[27] *Id.*
[28] *See generally* OnlyFans Terms of Service, https://onlyfans.com/terms (last visited July 24, 2023), attached hereto as Ex. A.
[29] *See* Terms of Use: Terms of Use for All Users § 2(k), available at https://onlyfans.com/terms and attached hereto as Ex. A.

59.     The Terms of Use for Fans states that Fans accept and agree to abide by the full TOS, acknowledge the potential for exposure to adult material, and agree to accept OnlyFans's subscription and purchasing policies.

60.     The Terms of Use for Creators states that Content Creators accept and agree to terms set by OnlyFans including how the Creator will receive payouts, determination of how to set a subscription price, restrictions on content, legal responsibility of the Creator, advertising rules, payout rules, and obligations to provide paid-for content.

61.     Before participating in any transaction, OnlyFans requires Fans to add a payment card to their account. Further, Content Creators must link their OnlyFans accounts to a bank account in order to receive earnings payments.[30]

62.     Fans can then subscribe to (or follow) Creator accounts of their choosing.

63.     OnlyFans allows Content Creators to set the monthly subscription fee for their accounts at between $0 to $50 per month.[31] After subscribing to a Creator's account, OnlyFans allows Fans to access the Creator's content.

64.     OnlyFans also tells Fans that they can interact with the Content Creator directly through direct messages and pay-per-view messages. OnlyFans tells Fans that by adding a monetary tip to a direct message, their message will appear at the top of the Creator's inbox, and Creators often invite Fans to send a tip with a message in order to get a faster reply from the Creator.

65.     In addition, OnlyFans allows Creators to maintain both standard pages and "VIP" pages in order to drive Fan visits, purchases, and tips. Standard pages usually entail free

---

[30] ONLYFANS, *Help: How do I start earning on OnlyFans?*, https://onlyfans.com/help/3/16/57 (last visited July 24, 2023).
[31] *See id.*

subscriptions and limited Creator content, but they actively lead Fans to VIP pages that require paid monthly subscriptions, offer access to preexisting content, and often promise faster replies to DMs and other Fan communications – usually for a tip.

66.     Like the other fees paid by Fans, tip transactions are conducted by Fenix Internet, and OnlyFans collects 20% of the tips.

### *OnlyFans Sells Fans on Communicating Directly with the Content Creators Themselves*

67.     To attract Fans to join OnlyFans and engage in these transactions, OnlyFans promotes itself as a social platform that allows Creators and users to develop personal, "authentic relationships."[32] This promotion scheme pervades OnlyFans' general advertising, the account creation process, and its platform that is exclusively accessible to OnlyFans users.

68.     OnlyFans has stated that its mission is: "OnlyFans is the social platform revolutionizing creator and fan connections. The site is inclusive of artists and content creators from all genres and allows them to monetize their content while developing *authentic relationships* with their fanbase."[33]

69.     OnlyFans specifically states on its "Why subscribe" page: "Subscribing to a Creator gives you exclusive access to private content being posted by that Creator and *gives you access to be able to communicate with them directly* via the direct messages interface (DM)."[34]

70.     OnlyFans represents to Fans that it monitors and controls use of its website, including the identities of those that post there.

---

[32] *See* ONLYFANS, *Our Team and Goals*, n.1, *supra* (OnlyFans describing itself as a platform through which "creators . . . monetize their content while developing authentic relationships with their fanbase").

[33] *Id.* (emphasis added).

[34] ONLYFANS, *Help: Why Subscribe?*, n.7, *supra.*

71.     Current CEO and former Chief Strategy and Operations Officer, Keily Blair has reinforced the importance of OnlyFans as a safe and trusted community where intimate communications are shared via authentic two-way dialogue between Fans and Creators.[35]  Blair further confirms that Fan-Creator contact is at the heart of the business model - a community where Fans are assured that OnlyFans is delivering on its promises – safe, direct, intimate, authentic communications between a Fan and a Creator.[36]

72.     OnlyFans' former CEO Ami Gan promotes tight controls as a key to OnlyFans business model, stating "Safety is ultimately the foundation of our entire business . . . . For example, we have no anonymity on the platform; we know who everyone is."[37]

73.     OnlyFans touts its safety and control measures as a benefit to Fans and Creators, including multi-point Creator verification measures. OnlyFans promises that its vast personnel team moderates every single message and communication between Fan and Creator and commits to remove bad actors from the site.

74.     OnlyFans emphasizes the critical importance of no anonymity of user and Creator on the OnlyFans platform which is at the heart of the OnlyFans platform, thus reassuring users that they know who they are communicating with.[38]

---

[35] https://www.youtube.com/watch?v=45bKq_deC-g (last visited August 20, 2023)
[36] *Id.*
[37] Bruner, *supra* n. 19.
[38] https://www.youtube.com/watch?v=45bKq_deC-g (last visited August 20, 2023)

75.    CEO Blair has stated publicly on social media that OnlyFans messaging is critical to its business.[39] Yet, OnlyFans' top Creators hire marketing agencies who tout the use of third party chatters for Fan messaging.[40] OnlyFans is well aware of these agencies.[41]

76.    OnlyFans's TOS, to which all users must agree in order to create an account and use OnlyFans, also contains numerous provisions that indicate that interactions on OnlyFans are between Fans and Content Creators.

77.    For example, the TOS prohibits "shar[ing] your account or any Content obtained from your use of OnlyFans to or with anyone else."[42]

78.    The TOS specifies that "Only individuals can be Creators."[43]

79.    The TOS prohibits fraudulent content, and further prohibits using OnlyFans to "engage in misleading or deceptive conduct, or conduct that is likely to mislead or deceive any other User."[44]

---

[39] *See* https://twitter.com/KeilyBlair/status/1552183744949354497 ("We don't like bots on @OnlyFans. All creators & fans are verified we don't have any. When an OF creator says they have x number of fans they are talking about *verified* fans. Before a creator posts a single post of @OnlyFans they are *verified*.").(last visited August 20, 2023).

[40] *See*, *e.g.*, SEO Bounty, OnlyFans Account Management, https://seobounty.com/account-management-and-growth/ (last visited July 24, 2023); The Bunny Agency, OnlyFans Marketing and Management at the Highest Level, https://bunny-agency.com/ (last visited July 24, 2023).; GhostChatters, Why Have Chatters, https://www.ghostchatters.com/why-have-chatters (last visited July 24, 2023); The Bunny Agency, NSFW Chatter for Only Fans, https://www.ghostchatters.com/why-have-chatters; https://bunny-agency.com/job/nsfw-chatter-for-onlyfans/ (last visited July 24, 2023). https://www.ofagency.co/services (last visited June 23, 2023).

[41] https://www.youtube.com/watch?v=fgOsTxLVpzM (last visited August 20, 2023)

[42] Terms of Service: Acceptable Use Policy § 1, available at https://onlyfans.com/terms and attached hereto as Ex. A.

[43] *Id.* § 7.

[44] *Id.* § 8.

80.     The TOS prohibits posting content "which has the effect of artificially increasing any Creator's views or interactions, or which is otherwise inauthentic, repetitive, misleading or low quality."[45]

81.     The TOS, in the Terms of Use for all Users, require both Content Creators and Fans to agree to the following terms:

> 7.  **Your commitments to us:** When you register with and use OnlyFans, you make the following commitments to us:
>
>     a.  You will make sure that all information which you submit to us is truthful, accurate and complete.
>
>     . . . .
>
>     e.  You will keep your account/login details confidential and secure, including your user details, passwords and any other piece of information that forms part of our security procedures, and you will not disclose these to anyone else.
>
>     f.  You are responsible for all activity on your account even if, contrary to the Terms of Service, someone else uses your account.

82.     The TOS defines "Fan/Creator Transaction" as an interaction between the user and the actual Content Creator, who must be an individual:

> any transaction between a Fan and a Creator on OnlyFans by which access is granted to the Creator's Content including in any of the following ways: (i) a Subscription, (ii) payments made by a Fan to view a Creator's pay-per-view Content (pay-per-view media and pay-per-view live stream), and (iii) use by the Fan of the fan interaction function on a Creator's account.

---

[45] *Id.* § 13.

83. The TOS further requires that Creators "perform your part of [paid] Fan/Creator Transaction[s]," including "providing the customized Content paid for by the Fan and/or allowing the Fan to use the fan interaction function paid for (as applicable)."[46]

84. The TOS requires that Creators warrant that content provided is "as described by you."[47]

85. Further, the TOS contains provisions that allow OnlyFans to withhold and even forfeit Creator earning if OnlyFans suspects and/or finds violations of the Terms of Service.[48]

86. Specifically, the TOS contains a section titled "Circumstances in which we may withhold Creator Earnings" and allows OnlyFans to withhold and even forfeit creator earnings, and return those earnings to the Fans, for violations such as:

> i. if we think that you have or may have seriously or repeatedly breached any part of the Terms of Service….

> iii. if we suspect that all or any part of the Creator Earnings result from unlawful or fraudulent activity, either by you or by the Fan who made the Fan Payment resulting in the Creator Earnings.[49]

87. The TOS even states that "[i]f once we have finished our investigation we determine that Creator Earnings are forfeited, we will (unless prohibited by law) use our best efforts to ensure that any Fan Payments which resulted in forfeited Creator Earnings are returned to the relevant Fans who paid such Fan Payments."[50]

88. The TOS conveys a sense of security for Fans that OnlyFans will ensure that the Fan is getting what is advertised and what they are paying for.

---

[46] Terms of Service: Terms of Use for Creators § 8(c), available at https://onlyfans.com/terms and attached hereto as Ex. A.
[47] *Id.* § 9(b)(v)(iii).
[48] *Id.* § 13.
[49] *Id.* § 13(a).
[50] *Id.* § 13(e).

89. Hence, OnlyFans's representation that it allows Fans and Content Creators to develop personal relationships through personal interactions, without the participation of unknown third parties, permeates OnlyFans's marketing, account creation, and every OnlyFans Fan's online experience.

90. As a result, this representation of authenticity defines OnlyFans's brand. It is OnlyFans's primary, if not its only, allure – direct communication with a Creator creating very specific photographs and videos. In pursuit of it, Fans often fork over large sums of money, which directly and considerably benefits OnlyFans's bottom line.

### *OnlyFans Ostensibly Provides Vehicles for Experiencing Genuine Connections*

91. In furtherance of its representations that Fans and Content Creators can form genuine connections on its platform, OnlyFans provides features that are specifically and uniquely designed to induce Fans to believe that they are able to develop such connections, such as the ability to send and receive DMs (including paid DMs) and receive PPV content.

92. Using these features, Fans may pay specifically for content that is purportedly created by the Content Creator specifically for them.

93. These features work. OnlyFans states that its "platform is designed to optimize creator engagement. When a creator posts, over 60% of their fans see and interact with the content. Over 80% of direct messages sent by creators are seen and opened."[51]

94. OnlyFans also provides a tipping feature through which Fans can tip Content Creators for the content they post, with a maximum tip amount of $100 for new Fans, and a maximum tip amount of $200 for Fans who have been on the platform for at least four months.

---

[51] OnlyFans, *Our Team and Goals: Content and Engagement*, n.1, *supra.*

95.     OnlyFans encourages tips as a mechanism for personalized communication by informing Fans, before they reply to a Creator message, that "[m]essages with tips appear at the top of [the Content Creator's] inbox."

96.     OnlyFans offers its Content Creators a feature on their account pages that purportedly indicates their availability. When a Fan visits a Creator's OnlyFans page who has enabled this feature, the Fan sees text indicating if the Creator is available or the last time the Creator was available. Like popular messaging platforms individuals use with their personal contacts, such as Facebook Messenger, when a Content Creator is purportedly available, a green dot appears in the Creator's profile. This is intended to signal to the Fan that the Creator themselves is available for direct communication.

97.     OnlyFans also allows Content Creators to enable a feature that indicates to Fans when their messages have been read. When this feature is enabled, a Fan will see two checkmarks below their sent message once it has purportedly been read by the Content Creator.

98.     Thus, OnlyFans has designed its platform to foster Fans' belief that Content Creators can and do exchange messages and customized content beyond what is already made available on the Content Creator's account to all subscribers. From a Fan's perspective, and based on OnlyFans's representations as described herein, these features should allow Fans to interact directly with Creators.

99.     OnlyFans also allows Content Creators to offer free subscriptions, meaning a fan does not pay a monthly subscription fee. Such accounts still allow for paid content such as PPVs and tipping, including sending DMs with tips, leading Fans to believe that, even with a free subscription, by paying for specific content or features, including sending tipped messages, they will be able to interact directly with the Creator.

100.    Unbeknownst to Fans, they are not getting what they pay for.

**In Reality, OnlyFans Aids Creators in Making Fraudulent Sales**

101.    Despite OnlyFans's clear message to users that OnlyFans's primary offering is "authentic relationships," through "direct communications," many high-earning Content Creators do not operate their own OnlyFans accounts and do not actually communicate with Fans.

102.    In particular, despite charging for direct interaction with Content Creators, OnlyFans turns a blind eye to Creators outsourcing Fan interaction to third parties that run the Creator's account and send DMs and PPVs to paying Fans in breach of the Terms of Service.

103.    For example, third-party individuals who are trained to extract maximum revenue from Fans communicate with Fans through DMs (posing as the Content Creator), sell PPV content pre-supplied by the Creator (frequently representing it as having been created for the specific Fan), and extract tips from Fans by posing as the Creator. In these arrangements, the actual Content Creator has no direct communication with Fans at all, making these transactions both fraudulent and a breach of OnlyFans's TOS.

104.    OnlyFans knows, or reasonably should know, of this widespread practice.

105.    High-earning Content Creators can generate most of OnlyFans's revenue. The top 1% of Creators generate 33% of all earnings on the platform.[52] OnlyFans's top creator earns an estimated $20 million dollars per month,[53] and many others make six figures per month.

106.    To earn such large paychecks, these top Creators must churn out more messages and PPV content than an individual could possibly write or create.

---

[52] James Clark, *How Much OnlyFans Creators Really Make* (Dec. 22, 2022), YAHOO!FINANCE, https://au.finance.yahoo.com/news/how-much-only-fans-creators-really-make-001225631.html.
[53] Spangler, *supra* n.24.

107. Because all of the content exchanged between the Creator account and Fans is exchanged through the OnlyFans platform, OnlyFans is or should be aware of the impossibly high volume of logins to, and DMs and PPV content sent through, the Creator account.

108. OnlyFans is aware or should be aware that many of its top Creators who have the green-light availability feature (described above) enabled are seemingly always available or become available almost immediately after a fan visits the creator's OnlyFans page. It would be physically impossible for an individual Content Creator to always be available to communicate with Fans.

109. OnlyFans tracks and documents all transactions between Fans and Creators in order to collect revenue and pay Creators, so it knows the number of DMs, PPV, and tips that a Content Creator sends and receives in any given interval.

110. OnlyFans also receives all of the revenue generated by high-earning Content Creators, which it distributes to Creators after taking its 20% cut.

111. Therefore, OnlyFans knows that certain top-earning Creators cannot possibly have earned their revenue on their own. It would be physically impossible for a single Creator to transmit, in a single day, the number of interactions that OnlyFans knows those Creators are purporting to transmit.

112. As the processor of all of the transactions generated by the content on the OnlyFans site, Defendant Fenix Internet also knows, or should reasonably know, that high-earning Content Creators do not operate their own accounts, and instead use third parties to conduct their messaging and provide the purportedly individualized content.

113. OnlyFans also knows, or should know, that this conduct is ongoing because of third-party agencies' marketing directed at Creators (not Fans).[54] Some such agencies even promote their "chatter" services to handle all of a Creators' communications and upsell content.[55]

114. In fact, some of these companies specifically market themselves as *OnlyFans* marketing and management agencies. For example, Adultcreator.co operates a website at www.ofagency.co that claims that it provides Creators with "chatters or Ghostwriters who help you make more money. 50 to 55% of the earnings of a creator coming from the chats sales."[56]

115. Upon information and belief, OnlyFans generally monitors use of its trademark on the internet. For example, OnlyFans maintains an approval process for Creators to use domain names "that contain the OnlyFans trademark or a confusingly similar term."[57]

116. However, OnlyFans takes no action to curtail the use by third party agencies of its own trademark.

117. OnlyFans knowingly allows this conduct to occur despite its obligations to prevent deceptive conduct and its contractual obligation to enforce the Terms of Service. OnlyFans earns money each time one of these deceptive transactions occurs.

118. All the while, Fans are unaware that they are not communicating with their subscribed-to Content Creator. OnlyFans does not provide any mechanism for Fans to verify

---

[54] *See, e.g.,* SEO BOUNTY, *OnlyFans Account Management*, https://seobounty.com/account-management-and-growth/ (last visited July 24, 2023); THE BUNNY AGENCY, *OnlyFans Marketing and Management at the Highest Level*, https://bunny-agency.com/ (last visited July 24, 2023). ;

[55] *See, e.g.*, GHOSTCHATTERS, *Why Have Chatters*, https://www.ghostchatters.com/why-have-chatters (last visited July 24, 2023); THE BUNNY AGENCY, *NSFW Chatter for Only Fans*, https://www.ghostchatters.com/why-have-chatters ; https://bunny-agency.com/job/nsfw-chatter-for-onlyfans/ (last visited July 24, 2023).

[56] https://www.ofagency.co/services (last visited June 23, 2023).

[57] Terms of Service: Terms of Use for Creators § 12(c), available at https://onlyfans.com/terms and attached hereto as Ex. A.

whether they are communicating with the Creator or with a third party posing as the Creator, or even inform them that the latter is possible.

### OnlyFans Wants Creators to Maximize Sales at all Costs, Including Deception

119.    Through its DM, PPV, and tipping features, along with monthly subscription fees that draw Fans through access to those features, OnlyFans amasses significant revenue for itself, all through the false promise that Fans are interacting with Creators in exchange for these payments.

120.    Pursuant to its TOS, OnlyFans retains 20% of the revenue generated by content on its site.[58] Approximately 40% of the revenue stems from monthly subscription fees, and approximately 60% stems from PPV, DM, and tipping.[59]

121.    Given OnlyFans's payment structure, the success of its Content Creators, particularly its highest-earning Creators, translates directly to substantial profit for OnlyFans.

122.    OnlyFans also provides instructions to Content Creators on how to promote their accounts and as result generate more revenue. The instructions include "[p]ost new content often," "[p]lace your OnlyFans link on your existing social media (Twitter, Instagram, etc.)," and "[p]romote your OnlyFans link anywhere you have followers."[60]

123.    OnlyFans also provides blog posts with such titles as "OnlyFans Campaigns: How to Market Like a Pro" and "How To Get Started With Video Editing." These blog posts are directed at Content Creators to try and help them with operating their accounts which in turn helps to drive earnings for OnlyFans.

---

[58] ONLYFANS, *Help: Payout Percentages*, *supra* n.3.
[59] Clark, *supra* n. 46.
[60] ONLYFANS, *Help: Tips for Creators*, https://onlyfans.com/help/3/21/86 (last visited July 24, 2023).

### *OnlyFans Offers No Controls Against Fraudulent Sales*

124.    OnlyFans does not maintain any security measures or safeguards to prevent the deceptive conduct described above.

125.    Despite the fact that the OnlyFans TOS includes provisions that allow OnlyFans to monitor and potentially withhold or forfeit Creator earnings for violations of the Terms of Service, OnlyFans fails to do so in regard to Creators using third parties to communicate and message through DMs and PPV with Fans.

126.    Despite verifying users' identities during the account creation process, OnlyFans does not require any authentication when an individual logs into the Creator account and, on information and belief, allows multiple individuals to be logged in to a single Content Creator's account at once.

127.    OnlyFans does not include any sort of disclaimer or warning language on its platform or in the TOS or other standardized account documents that would indicate to Fans that they might not be communicating directly with the Content Creator they are messaging, or that the Creator could use third parties to send messages.

128.    As a result, OnlyFans permits and facilitates the deceptive practice of Creators using third party agencies to pose as the Creator and interact with Fans.

### *OnlyFans Harms Fans Through its Deceptive Conduct*

129.    Based on OnlyFans's representations and omissions described herein, when a Fan pays money to engage with a Content Creator, there is an expectation that the money is being spent to interact with that specific Creator. When the interaction is in fact with an unknown third party, the Fan is harmed.

130.     OnlyFans induces Fans to spend money that they would not have spent, or spend more money than they would otherwise have spent, in order to use the features and access the content on its website.

131.     Not only does the Fan not receive what was paid for (an authentic interaction with a specific Content Creator), the Fan is being deceived and in some circumstances manipulated to pay for additional interactions.

132.     The harm that fans suffer is not only monetary but can also be emotional and mental harm upon discovery that the Fan has engaged in intimate exchanges with an impostor, or even multiple impostors.

**Plaintiff DeFranza's Experience with OnlyFans**

133.     Plaintiff DeFranza created an OnlyFans account in approximately May 2021.

134.     Plaintiff DeFranza chose to create an account in order to interact with Creator Yanet Garcia and other Content Creators he followed on other social media platforms.

135.     On or about May 10, 2021, Plaintiff DeFranza paid $20 to OnlyFans for a one-month subscription to Garcia's Creator account.

136.     On or about May 10, 2021, he sent a direct message to Garcia believing that he was interacting with her directly.

137.     That evening, he received a message from Garcia's account inviting him to pay in order to unlock additional messaging.

138.     In the following days, Plaintiff DeFranza received multiple messages from Garcia's account, including audio messages and images, requesting that he pay in order to "unlock" their content. He paid to unlock approximately one of these messages.

139. He sent multiple messages to Garcia in response. However, Garcia did not respond to the content of his messages, instead only sending invitations to purchase additional pay-per-view content.

140. Upon information and belief, a third-party agency, MN2S Management Ltd. or another agency acting on its behalf, ran Garcia's OnlyFans Creator account during the period during which DeFranza was attempting to communicate with her on the platform.

141. Unbeknownst to Plaintiff DeFranza, Garcia did not send or receive messages on OnlyFans herself. Instead, personnel from MN2S Management Ltd., or another agency acting on its behalf, posed as Garcia and read the messages that DeFranza sent to Garcia, and sent the messages that DeFranza received from Garcia's OnlyFans account.

142. On or about May 13, 2021, Plaintiff DeFranza paid $4.50 to OnlyFans for a one-month subscription to the account of Content Creator Gina Valentina.

143. On or about May 14, 2021, Plaintiff DeFranza sent a message to Valentina asking if they could meet in person. Shortly after he sent the message, two checkmarks appeared below it, which he understood to mean that the message had been read by Valentina.

144. Less than two hours later, he received a message from Valentina's account indicating that she "only play[ed] on [OnlyFans]," and inviting him to unlock a video for $3. He sent one more message to Valentina's account, to which he received a response, on or about May 16, 2021.

145. On or about July 5, 2022, OnlyFans notified Plaintiff DeFranza that Valentina had subscribed to his profile.

146. Upon information and belief, Valentina did not send or receive the messages sent to or from DeFranza from her OnlyFans account.

147.    Valentina's OnlyFans Creator account generates over $200,000 per month in revenue.

148.    Upon information and belief, a single individual could not send the number of DMs or PPVs that are required in order to generate the revenue that Valentina's account generates.

149.    Upon information and belief, the messages sent to and received from OnlyFans's Creator account are sent by a third party or third parties that impersonate her.

150.    DeFranza did not pay to renew or continue his one-month subscriptions to either Garcia's or Valentina's accounts.

151.    On or about March 22, 2023, Plaintiff DeFranza paid $20 to OnlyFans for another one-month subscription to Yanet Garcia's account.

152.    Upon information and belief, all of the payments that Plaintiff DeFranza made on the OnlyFans website were completed and processed by Fenix Internet.

153.    When Plaintiff DeFranza created his OnlyFans account, when he paid for subscriptions, when he sent and received messages to Content Creators, and when he paid to unlock content sent to him by Content Creators, Plaintiff DeFranza believed that he was interacting directly with Content Creators.

154.    If Plaintiff DeFranza had known that the messages sent to and from Garcia's and Valentina's Creator accounts were not read nor sent by Garcia or Valentina themselves, he would not have subscribed to their Creator accounts or would have paid less to subscribe to their Creator accounts.

155.    If Defendants were to curtail the unlawful practices alleged herein, Plaintiff DeFranza would consider spending money on the OnlyFans platform to subscribe to Creator accounts, message with Creators, and/or access Creator PPV content.

**Plaintiff McFadden's Experience with OnlyFans**

156.    Plaintiff McFadden created an OnlyFans account in approximately August 2020.

157.    Plaintiff McFadden chose to create an account in order to interact with a couple of women he knew from his gym that he learned were Content Creators on OnlyFans.

158.    Following his initial account creation, Plaintiff McFadden began to subscribe to the accounts of various Creators, including Riley Reid, Kimmy Granger, and others.

159.    Plaintiff McFadden paid to subscribe to Reid's Creator account in or about January 2022.

160.    Plaintiff McFadden paid additional fees to access content on Reid's Creator account. For example, he paid to send or receive messages from Reid on or about January 2022, and sent a monetary tip to Reid's account on or about April 12, 2022.

161.    Reid is the owner of All Star Hustle ("A.S.H."), a social media management agency focused on creators of adult content on OnlyFans.[61]

162.    Upon information and belief, Reid engaged A.S.H. or another agency on its behalf to run her OnlyFans Creator account, including sending and receiving messages from Fans, during the period in which Plaintiff McFadden was paying to access her content on the platform.

163.    Plaintiff McFadden also paid OnlyFans to access Granger's content. For example, he sent a tip to Granger on or about April 10, 2022 and paid to open a message purportedly from her on or about April 23, 2022.

164.    Upon information and belief, Granger also engaged A.S.H. or another agency acting on its behalf to run her OnlyFans Creator account, including sending and receiving messages

---

[61] Dan Miller, *Riley Reid Launches A.S.H. Agency; Firm to Specialize in Managing Creators' OnlyFans Accounts* (Apr. 27, 2021), AVN, https://avn.com/business/articles/technology/riley-reid-launches-a-s-h-agency-900535.html.

from Fans, during the period in which Plaintiff McFadden was paying to access her content on the platform.

165.  Specifically, Reid links to Granger's OnlyFans Creator page on her own website.

166.  Upon information and belief, the messages sent to and received from Reid and Granger were sent by individuals impersonating them.

167.  Plaintiff McFadden spent additional money on the OnlyFans platform, including to subscribe to, message with, and access content on other Creators' accounts. Upon information and belief, some of those Creators engaged third parties to communicate with Fans during the period that Plaintiff McFadden was paying to interact with them.

168.  When Plaintiff McFadden created his OnlyFans account, when he paid for subscriptions, when he sent and received messages to Content Creators, when he paid to unlock content sent to him by Content Creators, and when Plaintiff McFadden sent tips to Content Creators, Plaintiff McFadden believed that he was interacting directly with those Content Creators.

169.  If Plaintiff McFadden had known that the messages sent to and from those Creator accounts were not read nor sent by those Creators themselves, he would not have subscribed to their Creator accounts or would have paid less to subscribe to their Creator accounts.

170.  Over time, Plaintiff McFadden began to become suspicious of who he was actually communicating with when purportedly sending DMs with Creators, as messages he received contained typographical and syntax errors leading him to suspect that he was not communicating with the Creator he believed he was communicating with.

171.  As a result of these suspicions he stopped paying for direct messages or PPVs with those Creators.

172. If Defendants were to curtail the unlawful practices alleged herein, Plaintiff McFadden would consider spending money on the OnlyFans platform to subscribe to message with Creators and/or access Creator PPV content.

173. Upon information and belief, all of the payments that Plaintiff McFadden made on the OnlyFans website were completed and processed by Fenix Internet.

## CLASS ACTION ALLEGATIONS

174. Plaintiffs bring this lawsuit as a class action, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1)-(3), on behalf of themselves and all others similarly situated as members of the proposed Class. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

175. The Fed. R. Civ. P. 23(b)(2) Class is defined as:

> All U.S registered OnlyFans account holders who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, maintained an OnlyFans account and paid OnlyFans for one or more of the following, where the Creator engaged a third party to communicate with the account holder: (a) a subscription fee for the Creator-account, (b) a fee or payment to view the Creator's PPV content, (c) a fee or payment to send or receive a direct message (DM) to or from the Creator-account, or (d) a monetary tip to the Creator-account.

> Illinois subclass:

> All Illinois resident registered OnlyFans account holders who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, maintained an OnlyFans account and paid OnlyFans for one or more of the following, where the Creator engaged a third party to communicate with the account holder: (a) a subscription fee for the Creator-account, (b) a fee or payment to view the Creator's PPV content, (c) a fee or payment to send or receive a direct message (DM) to or from the Creator-account, or (d) a monetary tip to the Creator-account.

New Jersey subclass:

All New Jersey resident registered OnlyFans account holders who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, maintained an OnlyFans account and paid OnlyFans for one or more of the following, where the Creator engaged a third party to communicate with the account holder: (a) a subscription fee for the Creator-account, (b) a fee or payment to view the Creator's PPV content, (c) a fee or payment to send or receive a direct message (DM) to or from the Creator-account, or (d) a monetary tip to the Creator-account.

176.     The Fed. R.C.P. 23(b)(3) Class is defined as:

All U.S registered OnlyFans account holders who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, maintained an OnlyFans account and paid OnlyFans for one or more of the following, where the Creator engaged a third party to communicate with the account holder: (a) a subscription fee for the Creator-account, (b) a fee or payment to view the Creator's PPV content, (c) a fee or payment to send or receive a direct message (DM) to or from the Creator-account, or (d) a monetary tip to the Creator-account.


Illinois subclass:

All Illinois resident registered OnlyFans account holders who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, maintained an OnlyFans account and paid OnlyFans for one or more of the following, where the Creator engaged a third party to communicate with the account holder: (a) a subscription fee for the Creator-account, (b) a fee or payment to view the Creator's PPV content, (c) a fee or payment to send or receive a direct message (DM) to or from the Creator-account, or (d) a monetary tip to the Creator-account.


New Jersey subclass:

All New Jersey resident registered OnlyFans account holders who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, maintained an OnlyFans account and paid OnlyFans for one or more of the following, where the Creator engaged a third party to communicate with the account holder: (a) a subscription fee for the Creator-account, (b) a fee or payment to view the Creator's PPV content, (c) a fee or payment to send or receive a direct message (DM) to or from the Creator-account, or (d) a monetary tip to the Creator-account.

31

177.     Subject to additional information obtained through further investigation and discovery, the foregoing Class may be expanded or narrowed by amendment or amended complaint.

178.     Specifically excluded from the Class are Defendants and any of their respective officers, directors, legal representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff, and persons who timely and properly exclude themselves from the Class. Any entity in which one or more Defendants had a controlling interest or which had a controlling interest in one or more Defendants is also excluded from the Class.

179.     **Numerosity:** The members of the Class are so numerous such that joinder is impracticable. Plaintiffs believe there are in excess of one million individuals in the United States fitting the Class definition. Plaintiffs believe that there are thousands of individuals fitting in each of the subclass definitions. The exact number is unknown to Plaintiffs at this time and can only be confirmed from information and records in the possession, custody, or control of Defendants.

180.     **Commonality and Predominance**: There are numerous questions of law and fact common to the putative Class Members that predominate over any questions affecting only individual members of the Classes. The common questions in this case are capable of having common answers. If Plaintiffs' claim that Defendants unlawfully and improperly deceived and defrauded its Fans by allowing third parties to send communications on behalf of Content Creators in violation of OnlyFans's TOS, Plaintiffs and putative Class Members will have identical claims capable of being efficiently adjudicated and administered in this case. Among the common questions of law and fact are:

A.      Whether Defendants misrepresented to Plaintiffs and Class Members that they were interacting directly with Content Creators on the OnlyFans website;

B.      Whether Defendants omitted or concealed from Plaintiffs and Class Members the fact that third parties send messages to Fans on the OnlyFans website, posing as Creators;

C.      Whether high-earning Creators engage third-party agencies to communicate with Fans as though they were the Creators; thereby creating a scheme in which the Fans are not communicating with the Creators they believe they are communicating with;

D.      Whether Defendants know or should reasonably know that its high-earning Creators use third-party agencies to interact with Fans on the OnlyFans website;

E.      Whether Defendant helps facilitate the practice of third-party agencies pretending to act as high-earning Creators as they conduct the direct communications with Fans;

F.      Whether Defendant has business controls/practices/devoted resources in place to monitor its Platform in order to mitigate/eliminate unlawful, deceptive, and untruthful communications;

G.      Whether Defendant has a system in place for detecting unlawful, deceptive and untruthful communications or practices of Creators; and corresponding process to enforce and provide relief to those fans harmed; and if so the history of enforcement;

H.      Whether the Defendants are liable for statutory, compensatory and/or consequential damages and/or restitution and the amount of such damages and/or restitution;

I.     Whether Defendant's top earning Creators are physically able/capable of personally creating the entirety of the purportedly direct communications with their Fans to account for the massive profits they are generating every month;

J.     Whether Defendant should disgorge the unlawful profits it has obtained through the misuse of its platform by Creators who have hired third-party agencies or individuals to deceptively communicate with their Fans;

K.      Whether Defendant is working in concert with third-party agencies or individuals to unlawfully increase its profits;

L.     Whether Defendant had knowledge that its Creators were deceptively engaging thrip-party agencies to unlawfully inflate profits; and

M.     Whether Defendant should have known that its Creators were deceptively engaging thrip-party agencies to unlawfully inflate profits.

181.   **Typicality**: Plaintiffs' claims are typical of the claims of putative Class Members, as they are all based on the same factual and legal theories. The claims of Plaintiffs and putative Class Members are all premised on Defendants' knowingly facilitating conduct that allowed Fans to be deceived and defrauded.

182.   **Adequacy**: Plaintiffs willfully and adequately assert and protect the interests of the putative Class, and have retained competent counsel. Plaintiffs have obtained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other respective members of the Class and have the financial resources to do so. Plaintiffs have no interests antagonistic to those of the putative Class, and there are no defenses unique to Plaintiffs. Neither Plaintiffs nor their counsel have any interests adverse to those of the other putative Class Members.

183. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all putative Class Members is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the putative Class are in the millions of dollars, individual damages incurred by each putative Class Member resulting from Defendants' wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual putative Class Members prosecuting their own separate claims is remote, and even if every putative Class Member could afford individual litigation, the court system would be unduly burdened by individual litigation of such duplicative cases.

184. **Risks of Prosecuting Separate Actions**: The prosecution of separate actions by putative Class Members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For example, one court may determine damages should be calculated based on the number of messages received, while another may determine damages should be based on the cost to each Fan who was defrauded. Additionally, individual actions may be dispositive of the interests of the putative Class as a whole, although certain putative Class Members are not parties to such actions.

185. **Policies Generally Applicable to the Class**: This case is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Plaintiffs and the proposed Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Class. Defendants' practices challenged herein apply to and affect the members of the Class uniformly, and Plaintiffs' challenge to those practices hinges on Defendants' conduct with respect to the proposed Class as a whole, not on individual facts or law applicable only to Plaintiffs.

## CAUSES OF ACTION

### COUNT I
**Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing**
**(On behalf of the Nationwide Class against OnlyFans)**

186.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

187.    Plaintiffs and OnlyFans have contracted for services, as set forth above and as described in the Terms of Service and other related documentation.

188.    OnlyFans's Terms of Service explicitly state that a Creator must be an individual and that users, including Creators, cannot share accounts with others.

189.    OnlyFans's Terms of Service also state that, when Fans pay for services, the Creator must perform their part of the transaction, including providing the customized content paid for by the Fan.

190.    OnlyFans's Terms of Service prohibit misleading, deceptive, and fraudulent conduct.

191.    OnlyFans Terms of Service promise to Fans such as Plaintiffs and Class Members that paying to subscribe to a Content Creator's account would allow them to communicate directly with Content Creators. The Terms of Service further promise to Fans such as Plaintiffs and Class Members that, by sending a paid message to a Creator or by paying to view PPV messages, the Fan would be engaging in communications directly with the Content Creator.

192.    The OnlyFans Terms of Service create the reasonable expectation by Plaintiffs and Class Members that, by paying to subscribe to a Content Creator's account and by paying for messages or purportedly individualized content there, Plaintiffs and Class Members would be communicating directly with the Content Creator.

193.     Further, OnlyFans' Terms of Service authorize OnlyFans to withhold, forfeit, and return Creator earnings to Fans for serious or repeat breaches of the Terms of Service. This term promises to and/or creates a reasonable expectation by Plaintiffs and Class Members that OnlyFans will curtail serious or repeat breaches of the Terms of Service of which OnlyFans knows or has reason to know.

194.     Under the laws of the states where OnlyFans does business, parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over the other party. In such circumstances, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with the parties' reasonable expectations.

195.     This means that OnlyFans is prohibited from exercising its discretion to enrich itself by allowing and facilitating rampant breach of the Terms of Service to the detriment of Fans. Indeed, OnlyFans has a duty to honor the Terms of Service in a manner that is fair to Plaintiffs and Class Members.

196.     OnlyFans does not comply with its promises to Plaintiffs and Class Members that, by paying for services on and through the OnlyFans website, they would be able to communicate directly with Creators.

197.     Further, instead of exercising its discretion in good faith and consistent with customers' reasonable expectations, OnlyFans abuses that discretion by facilitating deceit by Creators, taking no action to stop that deceptive conduct, processing deceptive transactions, and taking its 20% cut of all such transactions.

198.     By exercising its discretion to enrich itself while participating in the deception of its customers, OnlyFans consciously and deliberately frustrates the agreed common purposes of

the contract and disappoints the reasonable expectations of Plaintiffs and Class Members, thereby depriving them of the benefit of their bargain.

199.    Plaintiffs and Class Members have performed all, or substantially all, of the obligations imposed on them under the Terms of Service as set forth above.

200.    Plaintiffs and Class Members have sustained damages as a result of OnlyFans's breaches of the Terms of Service as set forth above.

**COUNT II**
**Unjust Enrichment**
**(In the Alternative to Count I)**
**(On behalf of the Nationwide Class against Both Defendants)**

201.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

202.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

203.    This claim asserts that it is inequitable, unfair, and unjust to allow Defendants to retain profits from their deceptive, misleading, and unlawful conduct alleged herein.

204.    Defendants misrepresented to Plaintiffs and the Nationwide Class that, by purchasing paid subscriptions to a Creator's page, by paying to send or receive messages to Creators (including by sending tips), or by paying for a Creator's PPV content, Plaintiffs and Class Members would be interacting directly with the Creators.

205.    Plaintiffs and the Nationwide Class conferred benefits upon Defendants in the form of payments they made in order to interact directly with Creators.

206.    As detailed above, Defendants are aware that, unbeknownst to Fans, many of the highest-earning Creators on OnlyFans engage third party companies to interact with Fans. Defendants have knowingly participated in and facilitated this deceptive conduct.

207.    Plaintiffs and the Nationwide Class would not have made payments to Defendants or would have paid less if they had been aware that OnlyFans allowed third parties to impersonate Creators or that they were interacting with third parties instead of Creators.

208.    Defendants thus collected profits for their misrepresentation from Plaintiffs and the Nationwide Class.

209.    Defendants have knowledge or an appreciation of the benefit conferred upon them by Plaintiffs and members of the Nationwide Class.

210.    As a result of these actions, Defendants received benefits under circumstances where it would be inequitable, unfair, and unjust to retain these benefits.

211.    Defendants have been unjustly enriched.

212.    Plaintiffs and the Nationwide Class Members are entitled to restitution and/or disgorgement of all profits, benefits, and other compensation obtained and retained by Defendants as a result of their deceptive, misleading, and unlawful conduct.

**COUNT III**
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act:**
**Deceptive Practices**
**(On Behalf of Plaintiff McFadden and the Illinois Subclass against Both Defendants)**

213.    Plaintiff McFadden re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

214.    Defendants' conduct described herein violates the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. Ann. §§ 505/1-505/12.

215.    At all times relevant hereto, Plaintiff McFadden and the Illinois Subclass members were either natural persons or their legal representatives, partnerships, corporations, companies, trusts, business entities, or associations. 815 Ill. Comp. Stat. 505/1(c).

216. At all times relevant hereto, Plaintiff McFadden and Illinois Subclass Members were also "consumers" as defined by the ICFA because they purchased services from Defendants for their own personal use. 815 Ill. Comp. Stat. Ann. § 505/1(e).

217. The ICFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact." 815 Ill. Comp. Stat. 505/2.

218. Defendants' misrepresentations and omissions as described herein constitute "unfair or deceptive practices" within the meaning of the ICFA. For example:

    a. Defendants deceived Plaintiff McFadden and Illinois Subclass Members by misrepresenting to them that they were interacting with Content Creators directly on OnlyFans when in fact they were interacting with third parties impersonating Content Creators.

    b. Defendants deceived Plaintiff McFadden and Illinois Subclass Members by omitting or suppressing the material fact that they may be communicating with unknown third parties impersonating Content Creators rather than the Creators themselves.

219. Defendants intended that Plaintiff McFadden and Illinois Subclass Members rely on these misrepresentations and omissions in creating accounts on the OnlyFans website and making purchases on the OnlyFans website.

220. The misrepresentations and omissions described herein were material in that the identity of the individuals with whom they are interacting is the type of information upon which a reasonable consumer is expected to rely in making a decision to pay for communications or interactions on a social media website.

221.    Defendants' conduct described herein occurred in a course of conduct involving trade or commerce in Illinois, arose out of transactions that occurred in Illinois, and/or harmed individuals located in Illinois.

222.    Defendants engaged in such unlawful course of conduct with the intent to induce Plaintiff McFadden and Illinois Subclass members to purchase content on the OnlyFans website and pay more than they would have paid had they known that the Creators they were paying to interact with engaged third parties to interact with Fans.

223.    As a direct and proximate result of Defendants' conduct described herein, Plaintiffs and Illinois Subclass Members were misled and/or deceived.

224.    As a direct and proximate result of Defendants' conduct described herein, Plaintiffs and Illinois Subclass Members were damaged in that they did not receive the benefit of their bargain.

225.    As a direct and proximate result of Defendants' conduct described herein, Plaintiffs and Illinois Subclass Members suffered damage in the form of economic loss in that they would not have paid for, or would have paid less for, Defendants' services had they been aware that they were or might be interacting with third party impostors, rather than the Content Creators themselves.

226.    Plaintiff McFadden and the class members seek all monetary and nonmonetary relief allowed by law, including injunctive relief, actual damages, punitive damages, and attorneys' fees and costs.

## COUNT IV
### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act:
### Unfair Practices
### (On Behalf of Plaintiff McFadden and the Illinois Subclass against Both Defendants)

227.    Plaintiff McFadden re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

228.    Defendants' conduct described herein violates the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. Ann. §§ 505/1-505/12.

229.    At all times relevant hereto, Plaintiff McFadden and the Illinois Subclass members were either natural persons or their legal representatives, partnerships, corporations, companies, trusts, business entities, or associations. 815 Ill. Comp. Stat. Ann. § 505/1(c).

230.    At all times relevant hereto, Plaintiff McFadden and Illinois Subclass Members were also "consumers" as defined by the ICFA because they purchased services from Defendants for their own personal use. 815 Ill. Comp. Stat. Ann. § 505/1(e).

231.    The ICFA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to . . . the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965." 815 Ill. Comp. Stat. Ann. § 505/2.

232.    Defendants' acts and omissions described herein constitute unfair methods of competition and/or unfair acts or practices with respect to the content that Plaintiff McFadden and Illinois Subclass Members purchased on the OnlyFans website in that Defendants unfairly represented that Plaintiff and Class Members could interact directly with Content Creators by spending money on the site when in fact those Creators engaged third parties to communicate with Fans.

233.    Defendants' acts or practices were "unfair" as they offend public policy, are immoral, unethical, oppressive, and unscrupulous.

234.    Defendants' acts or practices are immoral and unethical as they serve only to benefit Defendants to the detriment of the consuming public.

235.    Defendants intended that Plaintiff McFadden and Illinois Subclass Members spend money on the OnlyFans website in reliance on these unfair acts and/or practices.

236.    The unfair acts and/or practices described herein were material in that the identity of the individuals with whom they are interacting is the type of information upon which a reasonable consumer is expected to rely in making a decision to pay for so-called authentic communications or interactions on a social media website.

237.    Defendants' conduct described herein occurred in a course of conduct involving trade or commerce in Illinois, arose out of transactions that occurred in Illinois, and/or harmed individuals located in Illinois.

238.    Defendants' acts or practices are also "unfair" because they were likely to cause, and did cause, substantial injury to consumers as they resulted in Defendants receiving revenue to which they were not entitled.

239.    Defendants engaged in such unlawful course of conduct with the intent to induce Plaintiff McFadden and Illinois Subclass members to purchase content on the OnlyFans website and pay more than they would have paid had they known that the Creators they were paying to interact with engaged third parties to interact with Fans.

240.    As a direct and proximate result of Defendants' conduct described herein, Plaintiffs and Illinois Subclass Members were damaged in that they did not receive the benefit of their bargain.

241.    As a direct and proximate result of Defendants' conduct described herein, Plaintiffs and Illinois Subclass Members suffered damage in the form of economic loss in that they would not have paid for, or would have paid less for, Defendants' services had they been aware that they were or might be interacting with third party impostors, rather than the Content Creators themselves.

242.    The injuries caused by Defendants' acts or practices, namely consumers' monetary losses, are not outweighed by any countervailing benefit to consumers or competition. Defendants' unfair acts served no purpose other than to increase their own profits.

243.    Because Defendants misrepresented and omitted material information, these injuries were not reasonably avoidable.

244.    Plaintiff McFadden and the class members seek all monetary and nonmonetary relief allowed by law, including injunctive relief, actual damages, punitive damages, and attorneys' fees and costs.

**COUNT V**
**Illinois Common Law Fraud**
**(On Behalf of Plaintiff McFadden and the Illinois Subclass against Both Defendants)**

245.    Plaintiff McFadden re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

246.    As described herein, Defendants made standardized false representations to Plaintiff McFadden and Illinois Subclass members that, by making payments on the OnlyFans platform, they would be able to interact directly with Content Creators. For example:

a.    OnlyFans' representation that "Subscribing to a Creator gives you exclusive access to private content being posted by that Creator and gives you access to be able to communicate with them directly via the direct messages interface (DM)."

b.    OnlyFans' statement of its mission as "allow[ing] [Creators] to monetize their content while developing authentic relationships with their fanbase."

c.    OnlyFans' representations throughout the Terms of Service that interactions are between Fans and Creators, including its prohibitions on sharing accounts and login information; its statement that "Only individuals can be Creators"; and its stated prohibitions against "inauthentic," "misleading," and "deceptive" conduct, including "conduct that is likely to mislead or deceive any user."

d.    OnlyFans' representation in its Terms of Service that Creator earnings will be returned to Fans when Creators violate the Terms of Service, when in fact OnlyFans knowingly facilitates the violations.

247.    As described herein, Defendants omitted, suppressed, and concealed the material fact in their standardized representations to Plaintiff McFadden and the Illinois Subclass members (including on the OnlyFans website, in the Terms of Service, and when soliciting and processing payments) that Content Creators with whom they paid to interact on the OnlyFans website engaged third parties to impersonate them and to interact with Fans such as Plaintiff and class members.

248.    Defendants made these representations and omissions knowingly or recklessly, as Defendants knew or should have known that Content Creators on OnlyFans, particularly the highest-earning Content Creators, regularly engage third parties to pose as the Creator and to communicate with Fans.

249.    Defendants intended that their misrepresentations and/or omissions as to the ability of Fans to interact with Creators on the OnlyFans platform would induce consumers including Plaintiff McFadden and the Illinois Subclass to spend money to make purchases on the OnlyFans website.

45

250.   Defendants knew that their misrepresentations and/or omissions were likely to induce Plaintiff McFadden and the Illinois Subclass to spend money on the OnlyFans website that they would not otherwise have spent.

251.   Defendants' misrepresentations and/or omissions were as to the type of information that a consumer would rely upon in deciding whether to spend money on a social media website: specifically, the identities of the individuals with whom they were paying to interact.

252.   Plaintiff McFadden and the Illinois Subclass justifiably relied on Defendants' misrepresentations and/or omissions as to their ability to interact directly with Content Creators when they decided to spend money on the OnlyFans website to purchase subscriptions, send paid messages, and/or pay for PPV content on OnlyFans.

253.   Plaintiff McFadden and the Illinois Subclass would not have paid for, or would have paid less for, Defendants' services had they been aware that they were or might be interacting with third party impostors.

254.   As a direct and proximate result of Defendants' conduct described herein, Plaintiff McFadden and Illinois Subclass Members were damaged in that they did not receive the benefit of their bargain.

255.   As a direct and proximate result of Defendants' conduct described herein, Plaintiff McFadden and Illinois Subclass Members suffered damage in the form of economic loss in that they would not have paid for, or would have paid less for, Defendants' services had they been aware that they were or might be interacting with third party impostors, rather than the Content Creators themselves.

256.   Plaintiff McFadden and the class members seek all monetary and nonmonetary relief allowed by law, including injunctive relief, actual damages, and punitive damages.

**COUNT VI**
**Violation of New Jersey Consumer Fraud Act**
**(On Behalf of Plaintiff DeFranza and the New Jersey Subclass against Both Defendants)**

257.     Plaintiff DeFranza re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

258.     Defendants' conduct described herein violates the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-1 *et seq*.

259.     Under the NJCFA, the use by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertising of merchandise is unlawful.

260.     "The standard of conduct that the term 'unconscionable' implies is lack of 'good faith, honesty in fact and observance of fair dealing.'" *Cox v. Sears Roebuck & Co*., 138 N.J. 2, 18 (1994) (quoting *Kugler v. Romain*, 58 N.J. 522, 544 (1971)). "In addition, '[i]ntent is not an essential element' for allegations related to unconscionable commercial practices to succeed." *Fenwick v. Kay Am. Jeep, Inc.,* 72 N.J. 372, 379 (1977).

261.     At all times relevant hereto, Defendant OnlyFans has been a "person" as defined by N.J. Stat. Ann. § 56:8-1(d).

262.     At all times relevant hereto, Defendant Fenix Internet has been a "person" as defined by N.J. Stat. Ann. § 56:8-1(d).

263.     At all times relevant hereto, Defendants have sold "merchandise" as defined by N.J. Stat. Ann. § 56:8-1(c)&(e).

264. Defendants' actions and omissions as described herein constitute consumer fraud within the meaning of the NJCFA. For example:

a.     Defendants knowingly deceived Plaintiff DeFranza and New Jersey Class Members by misrepresenting to them that they were interacting with Content Creators directly on OnlyFans when in fact they were interacting with third parties impersonating Content Creators.

b.     Defendants intentionally deceived Plaintiff DeFranza and New Jersey Class Members by knowingly omitting the material fact that Plaintiffs and Class Members may be communicating with unknown third parties impersonating Content Creators rather than the Creators themselves.

c.     Defendants' misrepresentations and omissions described herein demonstrate a lack of good faith, honesty in fact, and observance of fair dealing.

265. Defendants' misrepresentations and omissions as described herein were regarding material facts as they concerned facts upon which a reasonable consumer would rely, including the identities of the individuals with whom OnlyFans induced Plaintiff McFadden and New Jersey Class Members to pay to interact with.

266. Defendants' misrepresentations and omissions were likely to deceive reasonable consumers about the nature of the content that they were paying to access.

267. Defendants intended that Plaintiff McFadden and New Jersey Class Members rely on the misrepresentations and/or omissions described herein in determining whether to spend money on the OnlyFans platform.

268. As an actual and proximate result of Defendants' conduct described herein, Plaintiff McFadden and the New Jersey Class Members suffered ascertainable loss of monies. Plaintiffs

and Class Members would not have paid for, or would have paid less for, Defendants' services had they been aware that they were or might be interacting with third party impostors, rather than the Content Creators themselves.

269.    Plaintiffs and Class Members seek all monetary and nonmonetary relief allowed by law, including injunctive relief, actual damages, treble damages, punitive damages, and attorneys' fees and costs.

**COUNT VII**
**<u>New Jersey Common Law Fraud</u>**
**(On Behalf of Plaintiff DeFranza and the New Jersey Subclass against Both Defendants)**

270.    Plaintiff DeFranza re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

271.    As described herein, Defendants made standardized false representations to Plaintiff DeFranza and New Jersey Subclass members that, by making payments on the OnlyFans platform, they would be able to interact directly with Content Creators. For example:

   a.    OnlyFans' representation that "Subscribing to a Creator gives you exclusive access to private content being posted by that Creator and gives you access to be able to communicate with them directly via the direct messages interface (DM)."

   b.    OnlyFans' statement of its mission as "allow[ing] [Creators] to monetize their content while developing authentic relationships with their fanbase."

   c.    OnlyFans' representations throughout the Terms of Service that interactions are between Fans and Creators, including its prohibitions on sharing accounts and login information; its statement that "Only individuals can be Creators"; and its stated prohibitions against "inauthentic," "misleading," and "deceptive" conduct, including "conduct that is likely to mislead or deceive any user."

    d.    OnlyFans' representation in its Terms of Service that Creator earnings will be returned to Fans when Creators violate the Terms of Service, when in fact OnlyFans knowingly facilitates the violations.

272.    As described herein, Defendants omitted, suppressed, and concealed the material fact in their standardized representations to Plaintiff DeFranza and the New Jersey Subclass members (including on the OnlyFans website, in the Terms of Service, and when soliciting and processing payments) that Content Creators with whom they paid to interact on the OnlyFans website engaged third parties to impersonate them and to interact with Fans such as Plaintiff and class members.

273.    Defendants made these representations and omissions knowingly, as Defendants knew that Content Creators on OnlyFans, particularly the highest-earning Content Creators, regularly engage third parties to pose as the Creator and to communicate with Fans.

274.    Defendants intended that Plaintiff DeFranza and the New Jersey Subclass rely on their misrepresentations and/or omissions as to the ability of Fans to interact with Creators on the OnlyFans platform and therefore to spend money to make purchases on the OnlyFans website.

275.    Defendants' misrepresentations and/or omissions were as to the type of information that a consumer would rely upon in deciding whether to spend money on a social media website: specifically, the identities of the individuals with whom they were paying to interact.

276.    Plaintiff DeFranza and the New Jersey Subclass reasonably relied on Defendants' misrepresentations and/or omissions as to their ability to interact directly with Content Creators when they decided to spend money on the OnlyFans website to purchase subscriptions, send paid messages, and/or pay for PPV content on OnlyFans.

277.     Plaintiff DeFranza and the New Jersey Subclass would not have paid for, or would have paid less for, Defendants' services had they been aware that they were or might be interacting with third party impostors.

278.     As a direct and proximate result of Defendants' conduct described herein, Plaintiff DeFranza and New Jersey Subclass Members were damaged in that they did not receive the benefit of their bargain.

279.     As a direct and proximate result of Defendants' conduct described herein, Plaintiff DeFranza and New Jersey Subclass Members suffered damage in the form of economic loss in that they would not have paid for, or would have paid less for, Defendants' services had they been aware that they were or might be interacting with third party impostors, rather than the Content Creators themselves.

280.     Plaintiff DeFranza and the class members seek all monetary and nonmonetary relief allowed by law, including injunctive relief, actual damages, and punitive damages.

**COUNT VIII**
**(In the Alternative to Count VII)**
**<u>New Jersey Negligent Misrepresentation</u>**
**(On Behalf of Plaintiff DeFranza and the New Jersey Subclass against Both Defendants)**

281.     Plaintiff DeFranza re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

282.     As described herein, Defendants made standardized false representations to Plaintiff DeFranza and New Jersey Subclass members that, by making payments on the OnlyFans platform, they would be able to interact directly with Content Creators. For example:

   a.     OnlyFans' representation that "Subscribing to a Creator gives you exclusive access to private content being posted by that Creator and gives you access to be able to communicate with them directly via the direct messages interface (DM)."

b.    OnlyFans' statement of its mission as "allow[ing] [Creators] to monetize their content while developing authentic relationships with their fanbase."

c.    OnlyFans' representations throughout the Terms of Service that interactions are between Fans and Creators, including its prohibitions on sharing accounts and login information; its statement that "Only individuals can be Creators"; and its stated prohibitions against "inauthentic," "misleading," and "deceptive" conduct, including "conduct that is likely to mislead or deceive any user."

d.    OnlyFans' representation in its Terms of Service that Creator earnings will be returned to Fans when Creators violate the Terms of Service, when in fact OnlyFans does not enforce this provision as to Creators engaging third parties.

283.    As described herein, Defendants omitted the material fact in their standardized representations to Plaintiff DeFranza and the New Jersey Subclass members (including on the OnlyFans website, in the Terms of Service, and when soliciting and processing payments) that Content Creators with whom they paid to interact on the OnlyFans website engaged third parties to impersonate them and to interact with Fans such as Plaintiff and Class Members.

284.    Defendants made these representations and omissions negligently, as Defendants should have known that Content Creators on OnlyFans, particularly the highest-earning Content Creators, regularly engage third parties to pose as the Creator and to communicate with Fans.

285.    Defendants, through their partial statements regarding the ability of Fans to interact with Creators on the OnlyFans platform, owed a duty to Plaintiff DeFranza and New Jersey Class Members to disclose that OnlyFans Creators, particularly the highest-earning Creators, engage third parties to impersonate them and interact with Fans through the site.

286.     Defendants intended that Plaintiff DeFranza and the New Jersey Subclass rely on their misrepresentations and/or omissions as to the ability of Fans to interact with Creators on the OnlyFans platform and therefore to spend money to make purchases on the OnlyFans website.

287.     Defendants' misrepresentations and/or omissions were as to the type of information that a consumer would rely upon in deciding whether to spend money on a social media website: specifically, the identities of the individuals with whom they were paying to interact.

288.     Plaintiff DeFranza and the New Jersey Subclass reasonably relied on Defendants' misrepresentations and/or omissions as to their ability to interact directly with Content Creators when they decided to spend money on the OnlyFans website to purchase subscriptions, send paid messages, and/or pay for PPV content on OnlyFans.

289.     Plaintiff DeFranza and the New Jersey Subclass would not have paid for, or would have paid less for, Defendants' services had they been aware that they were or might be interacting with third party impostors.

290.     As a direct and proximate result of Defendants' conduct described herein, Plaintiff DeFranza and New Jersey Subclass Members were damaged in that they did not receive the benefit of their bargain.

291.     As a direct and proximate result of Defendants' conduct described herein, Plaintiff DeFranza and New Jersey Subclass Members suffered damage in the form of economic loss in that they would not have paid for, or would have paid less for, Defendants' services had they been aware that they were or might be interacting with third party impostors, rather than the Content Creators themselves.

292.     Plaintiff DeFranza and the class members seek all monetary and nonmonetary relief allowed by law, including injunctive relief, actual damages, and punitive damages.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs, individually and on behalf of all other Class Members proposed in this Complaint, request that the Court enter judgment in their favor against Defendants and:

A.       Determine that this matter may proceed as a class action and certifying the Classes/Subclasses as alleged herein;

B.       Appoint Plaintiffs as representatives of the Class/Subclasses alleged herein, and appoints Plaintiffs' counsel as Class counsel;

C.       Award Plaintiffs and the putative Class Members compensatory and consequential damages, as set forth above;

D.       Award Plaintiffs and the putative Class Members punitive damages, as set forth above;

E.       Award full restitution of all funds acquired from Defendants' unlawful conduct;

F.       Award injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein;

G.       Award Plaintiffs reasonable costs and attorneys' fees incurred in the prosecution of this action , as set forth above;

H.       Award pre-judgement and post-judgment interest, as provided by law or equity; and

I.       Grant such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: August 25, 2023                        Respectfully submitted,

*/s/ Andrea R. Gold*
Andrea R. Gold (#6282969)
Shana Khader (#5015995)
**TYCKO & ZAVAREEI, LLP**
2000 Pennsylvania Avenue, NW
Suite 1010
Washington, DC 20006
Phone: (202) 973-0900
Facsimile: (202) 973-0950
Email: agold@tzlegal.com
Email: skhader@tzlegal.com

Keith T. Vernon*
**TIMONEY KNOX, LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
Phone: (215) 646-6000
Facsimile: (215) 591-8246
Email: kvernon@timoneyknox.com

Andrew W. Knox*
Chloe Mullen-Wilson*
**TIMONEY KNOX, LLP**
400 Maryland Drive
Fort Washington, PA  19034
Phone: (215) 646-6000
Facsimile: (215) 591-8246
Email: aknox@timoneyknox.com
Email: cmullen-wilson@timoneyknox.com

Jonathan Shub
**SHUB LAW FIRM, LLC**
134 Kings Highway East, 2nd Floor
Haddonfield, NJ  08033
Tel: (610) 453-6551
Email: jshub@shublawyers.com

Troy M. Frederick*
Beth A. Frederick*
**FREDERICK LAW GROUP PLLC**
836 Philadelphia Street
Indiana, Pennsylvania 15701
Phone: (724) 801-8555
Fax: (724) 801-8358

Email: TMF@FrederickLG.com
Email: BAF@FrederickLG.com

David M. Ferris*
Brian R. Charville*
**FERRIS & CHARVILLE, LLC**
118 Turnpike Road, Suite 300
Southborough, MA 01772
Phone: (508) 281-5600
Facsimile: (508) 229-0356
Email: david@ferrisdevelopment.com
Email: bcharville@ferrisdevelopment.com

*Counsel for Plaintiffs Philip McFadden, John P. DeFranza, and the Putative Class*

*\* Pro Hac Vice Admission
 Applications Forthcoming*