IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PHILLIP MCFADDEN AND JOHN
DEFRANZA,
*individually and on behalf of all others
similarly situated,*

        Plaintiffs,

    *v.*

FENIX INTERNET and FENIX
INTERNATIONAL LIMITED,

        Defendants.

Case No. 1:23-cv-06151

**DECLARATION OF ANTONY WHITE KC IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS UNDER FORUM NON
CONVENIENS OR, IN THE ALTERNATIVE, MOTION TO DISMISS
UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(b)(2) AND 12(b)(6)**

I, Antony Dennis Lowndes White KC, under penalty of perjury, declare and state as follows:

1.  I am over the age of twenty-one years, suffer from no legal disability, and am competent to make this declaration and testify to the statements and facts contained herein.

2.  I am barrister-at-law called to the bar of England and Wales in 1983, and was appointed Queen's Counsel in 2001.  Upon the Death of Queen Elizabeth II I became King's Counsel.  I have practiced as a self-employed barrister in England since 1984.  I am also a member of the bar of Northern Ireland, and I have been admitted on several occasions to the bars of Gibraltar and the Isle of Man to appear as an advocate in cases in those jurisdictions.  I am a member of the London barristers' chambers, Matrix Chambers, Griffin Building, Gray's Inn, London WC1R 5LN.  A copy of relevant pages of my Chambers website biography is annexed hereto as Exhibit A.  I obtained a law degree (MA) from Cambridge University.

3.  My legal expertise includes, but is not limited to, electronic commerce,  privacy and data protection, commercial litigation, and international arbitration.  In the field of electronic commerce, data protection and privacy, where the relevant parties often include consumers, I have regularly advised and appeared in cases involving consumer protection law. In addition, a significant part of my practice involves jurisdictional disputes, often involving litigation arising out of events occurring partly or wholly in foreign countries (including the United States) where there are issues about whether a claim can or must be brought in England.

4.  I have been asked by Cooley LLP to address the following questions in the context of the action filed by Mr. Philip McFadden and Mr. John P. DeFranza (collectively, the "Plaintiffs") against the Defendants Fenix Internet LLC ("Fenix Internet") and Fenix International Limited ("FIL") (collectively, the "Defendants") in the United States District Court for the Northern District of Illinois, Eastern Division ("the U.S. Proceedings"):

      a.  Whether the English courts would accept jurisdiction over the Plaintiffs' claims if proceedings advancing similar claims were to be brought against the Defendants in England ("Equivalent English Proceedings");

---

    b.   Whether, under English law, the exclusive jurisdiction clauses agreed to by the Plaintiffs are valid and enforceable;

    c.   Whether English law would provide a remedy in respect of the claims advanced by the Plaintiffs; and

    d.   Whether the English courts would provide a convenient forum for the efficient, just, and expeditious resolution of such claims.

5.     In the interest of simplicity, I will hereafter refer only to "English law" and the law or courts of England, rather than to "England and Wales."

6.     To address these questions, I have considered the following:

    a.   The Class Action Complaint filed by the Plaintiffs in the U.S. Proceedings;

    b.   The Declaration of Mr. Lee Taylor dated 18th of December 2023;

    c.   The operative Terms of Service (the "Terms of Service") for the website www.OnlyFans.com ("OnlyFans") attached to the Class Action Complaint as Exhibit A; and

    d.   The applicable case law, legal textbooks, and statutory materials referenced herein.

**Jurisdiction of the English Courts over Equivalent English Proceedings**

7.     With regard to the Plaintiffs, I understand from Mr. Taylor's Declaration that the Plaintiffs agreed to the Terms of Service when they signed up as fans, and that both Plaintiffs agreed to the updated Terms of Service that went into effect on December 15, 2021. Taylor Declaration ("Taylor Decl.") ¶¶ 14–23. This is consistent with paragraphs 33 and 187 of the Class Action Complaint.

8.     Section 16.a of the applicable Terms of Service provides:

For consumers (Fans):

- Consumers – Law

---

      o  If you are a consumer, your agreement with us is governed by English law and English law will apply to (i) any claim that you have arising out of or in connection with your agreement with us or your use of OnlyFans, and (ii) any claim that we have against you that arises out of or in connection with your agreement with us or your use of OnlyFans (including, in both cases, non-contractual disputes or claims). You will also be able to rely on mandatory rules of the law of the country where you live.

**Consumers – where claims must be brought:**

. . .

      o  If you are a consumer resident **outside** of the United Kingdom or the European Union, any claim which you have or which we have arising out of or in connection with your agreement with us or your use of OnlyFans (including, in both cases, non-contractual disputes or claims) must be brought in the courts of England and Wales.

*Id.*, Ex. B at Section 16.a (emphasis in original).

    9.    In my view it is clear that the English courts would accept jurisdiction over Equivalent English Proceedings brought against either or both Fenix Internet or FIL based on the allegations in the U.S. Proceedings. In summary, as explained below, FIL, which I understand is incorporated in England and Wales with its headquarters in London, could be sued as of right (i.e., without seeking the permission of the court) in the English courts. In any case, I am informed that FIL has confirmed that if proceedings were commenced against it in the English courts arising out of the facts alleged in the U.S. Proceedings it would take no objection based on jurisdiction or forum (*see* Taylor Decl. ¶ 28). Proceedings could be served on Fenix Internet outside the jurisdiction, but in any case I am informed that Fenix Internet has also offered to stipulate to jurisdiction and service should proceedings in England or Wales be commenced (*see* Taylor Decl. ¶ 29).

    10.    The procedure of English civil litigation is governed by the Civil Procedure Rules 1998, as amended (the "CPR"). The CPR provide that civil litigation is commenced by service of a claim form, the modern English equivalent of a writ. Proceedings before the English courts against Fenix Internet or FIL would be started by serving a claim form issued in accordance with Part 7 of the CPR. In some situations, primarily where a defendant is present within

---

England and Wales as is the case with FIL, the claim form can be served on the defendant without obtaining the permission of the court.  In other situations, including in particular some (but not all) cases where a defendant is not present within England and Wales, the permission of the court may be required to serve the claim form on the defendant outside England and Wales. The rules governing whether the permission of the court is required before a claim form can be served on a defendant are contained in Part 6 of the CPR.  Under English law, jurisdiction over a claim is *prima facie* established by service in accordance with these rules.

11.     In the case of a claim against FIL based on the allegations made by the Plaintiffs in the U.S. Proceedings, service of the claim form could be effected without obtaining the permission of the court.  This is because FIL is a company incorporated and registered in England and Wales and it can either be served at its principal office or any place within the jurisdiction where it carries on its activities and which has a real connection with the claim under CPR 6.3(2)(a) read together with CPR 6.9(2)(6), or at its registered office under CPR 6.3(2)(b) read together with s. 1139 of the Companies Act 2006.  These are parallel statutory bases for service of proceedings on a company incorporated and registered in England and Wales.  The availability of these straightforward bases for service of the claim form on FIL, coupled with the confirmation given by FIL in Mr. Taylor's Declaration that, if proceedings are commenced against it in the English courts arising out of the facts alleged in the U.S. Proceedings, it will take no objection based on jurisdiction or forum, means that there is no realistic prospect that the Plaintiffs might encounter any difficulty in effecting service on FIL.

12.     In the case of a claim against Fenix Internet based on the allegations made by the Plaintiffs in the U.S. Proceedings, service of the claim form on Fenix Internet can be effected without obtaining the permission of the court even though Fenix Internet is not present within England and Wales.  This is because CPR 6.33(2B)(b) permits service of a claim form outside England and Wales without the permission of the court where a contract contains a term to the effect that the English courts shall have jurisdiction to determine the claim.  The exclusive

---

jurisdiction clauses in the Terms of Service are just such a term, and, accordingly, service can be effected under CPR 6.33(2B)(b). Alternatively, should the Plaintiffs raise any concerns about the availability of service under CPR 6.33(2B)(b), the Illinois court could require Fenix Internet to provide an address for service in England on a named solicitor for the purposes of CPR 6.7 (which provides for service within England and Wales without the permission of the court where the defendant has given in writing the business address within the jurisdiction of a solicitor as an address at which the defendant may be served with the claim form). The confirmation given by Fenix Internet in Mr. Taylor's Declaration that, if proceedings are commenced against it in the English courts arising out of the facts alleged in the U.S. Proceedings, it will stipulate to jurisdiction and service in England or Wales, means that there is no realistic prospect that the Plaintiffs might encounter any difficulty in effecting service on Fenix Internet.

### The exclusive jurisdiction clause

13.     Section 16.a of the Terms of Service contains an exclusive jurisdiction clause[1] as a matter of English law. In ***Sinochem International Oil (London) Co. Ltd v Mobil Sales and Supply Corp Ltd*** [2000] 1 All ER (Comm) 758 at [32] the test for identifying an exclusive jurisdiction clause was formulated as "*whether on its proper construction the clause obliges the parties to resort to the relevant jurisdiction, irrespective of whether the word 'exclusive' is used... Or to put the issue in another way: is the obligation contained in the clause the intransitive one to submit to a jurisdiction if it is chosen by the other contracting party, or is it the transitive one to submit all disputes to the chosen jurisdiction?*"[2] See also the summary of

---

[1] Exclusive jurisdiction clauses are subject to special rules under English law in relation to proceedings whose subject-matter is a matter relating to a consumer contract where the consumer is domiciled in the United Kingdom – *see* section 15B of the Civil Jurisdiction and Judgments Act 1982 (as amended). But these special rules do not apply to proceedings where the consumer is not domiciled in the UK.

[2] The utility of the intransitive/transitive distinction has been questioned in some later cases, but the preponderance of authority still favours it.

---

the case law in the leading textbook, Dicey, Morris & Collins on The Conflict of Laws, 16th edition, paragraphs 12-073-12-074.

14.     In the case of Section 16.a of the Terms of Service the language is clear.  The obligation is framed as a transitive obligation on both parties to submit their disputes to the English courts: "*any claim which you have or which we have arising out of or in connection with your agreement with us or your use of OnlyFans (including, in both cases, non-contractual disputes or claims) must be brought in the courts of England and Wales*."  The clause is mutual, couched in mandatory terms ("must"), and although it does not explicitly provide for exclusive jurisdiction the test formulated in *Sinochem International* shows that this is not determinative ("*irrespective of whether the word 'exclusive' is used*").  Further, the clause also provides for English law to apply to any claim, and the court's observation in **Sinochem International** at [33] that "*there is not much point in choosing a specific law to accompany a jurisdiction clause unless the intention is to make the courts where such law operates exclusive*" is on point.

15.     As to the scope of the exclusive jurisdiction clause in Section 16.a of the Terms of Service, English law generally adopts a wide construction of such clauses, recognising that contracting parties are likely to wish to ensure that all claims arising out of a contractual relationship fall within the same dispute resolution regime chosen by them.  This is well-established in the case of commercial contracts *(see **Fiona Trust & Holding Corp v Privalov** [2007] Bus L.R. 1719 at [13] ("*rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered or purported to enter to be decided by the same tribunal.  The clause should be construed in accordance with this presumption unless the language makes it clear that certain questions were intended to be excluded ...*")).[3] Although the *Fiona Trust* case formulated a rule of construction based on the presumed intentions of rational businessmen, English law would also assume that rational consumers and

---

[3] Although the **Fiona Trust** case concerned the scope of an arbitration clause, it is well established that the same principle of construction applies to jurisdiction clauses.  See e.g., **Sebastian Holdings Inc v Deutsche Bank AG** [2010] 2 CLC 300 at [39].

the rational businesses they contract with would prefer a one-stop shop dispute resolution mechanism to reduce the risk of fragmentation of disputes. For this reason a wide construction is given to jurisdiction agreements generally, and not only in a commercial context - see ***Emmott v Michael Wilson & Partners*** [2017] 2 All ER (Comm)[4] at [44(ii)- (iii)] (clause expressed "*in wide terms and it is likely that the parties intended that any dispute arising out of or connected with*" their relationship should be covered by it, particularly where nothing in the language of their agreement indicated that the parties contemplated any other form of dispute resolution for any particular disputes that might arise from their arrangement), cited in the leading textbook, Lewison on the Interpretation of Contracts, 7th edition, para 18.16.

16.    The wording used in Section 16.a is very wide – "*any claim which you have or which we have arising out of or in connection with your agreement with us or your use of OnlyFans (including, in both cases, non-contractual disputes or claims)*". The opening words "*any claims*" indicates that <u>all</u> claims are covered. The words "*arising out of or in connection with*" are a recognized formula which casts a very wide net. The addition of "*or your use of OnlyFans*" widens the scope beyond disputes relating to the agreement. The express inclusion of non-contractual disputes or claims underlines the width of the intended application of the clause. In my view it is clear that as a matter of English law the factual allegations relied on in support of the Plaintiffs' claims in the US Proceedings would be regarded as "*arising out of or in connection with your agreement with us or your use of OnlyFans (including, in both cases, non-contractual disputes or claims)*".

17.    The obligations set forth in Section 16.a are enforceable as a matter of English law and will be enforced in the absence of strong reasons to the contrary.

18.    As Lord Bingham explained in the leading case of ***Donohue v. Armco Inc***. [2002] C.L.C. 440 at [24]: "*If contracting parties agree to give a particular court exclusive jurisdiction*

---

[4] Although the actual decision in ***Emmott*** was overturned on appeal on other grounds, the approach taken by the Judge to the interpretation of the clause in question was not questioned – see [2018] 1 CLC 77.

*to rule on claims between those parties, and a claim falling within the scope of the agreement is made in proceedings in a forum other than that which the parties have agreed, the English court will ordinarily exercise its discretion (whether by granting a stay of proceedings in England, or by restraining the prosecution of proceedings in the non-contractual forum abroad, or by such other procedural order as is appropriate in the circumstances) to secure compliance with the contractual bargain, unless the party suing in the non-contractual forum (the burden being on him) can show strong reasons for suing in that forum. ... the general rule is clear: where parties have bound themselves by an exclusive jurisdiction clause effect should ordinarily be given to that obligation in the absence of strong reasons for departing from it. Whether a party can show strong reasons, sufficient to displace the other party's prima facie entitlement to enforce the contractual bargain, will depend on all the facts and circumstances of the particular case.*"

19.     As this quotation from ***Donohue v Armco*** states, the burden of showing strong reasons not to enforce the clause is on the party opposing its enforcement.  See also ***Catlin Syndicate Ltd v. Amec Foster Wheeler USA Corp*** [2021] 2 CLC 15 at [33(vii)-(viii)], (applying ***Donohue v Armco*** and granting injunction against suit filed in New Jersey in breach of an exclusive jurisdiction clause).  Based on my review of the Class Action Complaint and the Taylor Declaration, the Plaintiffs in the US Proceedings have provided no basis for an English court to find that strong reasons not to enforce the exclusive jurisdiction clause exist with respect to their claims.

20.     Paragraphs 27-30 of the Class Action Complaint seek to rely on certain matters in support of a contention in paragraph 26 thereof that "*Venue is not proper in England or Wales, and English law should not apply, notwithstanding OnlyFans's Terms of Service.*" However, the points made in paragraphs 27-29 seem to be points relating to the contractual relationship between the parties, or the Defendants' alleged conduct, which could be raised before the English court in Equivalent English Proceedings, and would not provide any basis for an

---

English court to find that that there are strong reasons not to enforce the exclusive jurisdiction clause. The assertion in paragraph 30 of the Class Action Complaint that "*England would not provide an adequate substantive remedy or class action vehicle to vindicate Plaintiffs' claims on behalf of the putative class*" is incorrect for the reasons explained below in paragraphs [49-53]. I reserve the right to supplement this declaration should the Plaintiffs provide further information or argument as to why they believe the exclusive jurisdiction clause should not be enforced.

21.     I note that in Section 16.a of the Terms of Service the choice of law clause applicable to the Plaintiffs states that consumers (Fans) "*will also be able to rely on mandatory rules of the law of the country where you live.*" Based on my review of the Class Action Complaint and the Taylor Declaration, I have seen no indication that the Plaintiffs rely on any mandatory rule of the law of the country where they live which is inconsistent with the position under English law which I have described above. I reserve the right to supplement this declaration should the Plaintiffs provide further information or argument as to why a mandatory rule of the law of the country where they live is inconsistent with the position under English law which I have described. Subject to this point, as a matter of English law, the Plaintiffs, by bringing the claims set out in the Class Action Complaint, have acted in breach of contract by bringing those claims in a jurisdiction other than England, contrary to the obligation imposed by Section 16.a. Based upon the above analysis, the English court would accept jurisdiction over Plaintiffs' claims should Equivalent English Proceedings be commenced.

### The English Courts Would Provide a Remedy with Respect to the Plaintiffs' Claims

22.     For the reasons detailed below, it is my opinion that English courts and English law would provide Plaintiffs with a potential remedy with respect to each aspect of the substance of their claims in the U.S. Proceedings, subject always to proof of the relevant facts which are alleged in the U.S. Proceedings.

23.     In this regard, I do not address the defences to the Plaintiffs' claims which Fenix Internet or FIL may advance, nor do I express any view as to the merits of the claims alleged by the Plaintiffs.  I consider only whether there are claims which would be open to the Plaintiffs under English law on the basis of the facts alleged by the Plaintiffs should they commence Equivalent English Proceedings.

24.     If Equivalent English Proceedings based on the allegations in the U.S. Proceedings were commenced, the English court would apply its own conflict of laws analysis to each of the claims advanced, subject to the choice of law clause in Section 16.a of the Terms of Service, which provides that the agreement between consumers (Fans) and FIL is governed by English law and English law will apply to any claim that consumers (Fans) have arising out of or in connection with their agreement with FIL or their use of OnlyFans.  Section 16.a also provides that consumers (Fans)  may "*rely on mandatory rules of the law of the country where [they] live.*"  The Plaintiffs in the US Proceedings appear to rely on provisions of US law, Illinois law and New Jersey law. Pursuant to this choice of law clause an English court would first consider whether any US law, Illinois law or New Jersey law provision on which the Plaintiffs in Equivalent English Proceedings sought to rely was a mandatory rule of law in the country where they live.  If so, that provision of US law, Illinois law or New Jersey law would be applied by the English court.

25.     This analysis, conducted by the English court, would result in a potential remedy for the factual allegations underlying the Class Action Complaint, regardless of whether the English court decided to apply, on the one hand, the provisions of US law, Illinois law or New Jersey law (or any of those provisions), or, on the other hand, the corresponding provisions of English law, discussed further below.

26.     In addition, it is open to the parties to litigation before the English courts to agree on the law applicable to their dispute.  Therefore, if the parties agreed (or the Illinois Court

ordered) that certain of the Plaintiffs' claims were subject to a mandatory rule of US law, Illinois law or New Jersey law, then that provision would be applied by the English court.

27.     English courts commonly apply foreign law to the substance of disputes, and expert evidence is admitted to establish the foreign law in question. If the English court decides that the claims brought by the Plaintiffs are governed by US law, Illinois law or New Jersey law, the English court is competent to apply that law and will afford Plaintiffs similar remedies, if appropriate.

28.     If and to the extent that the English court decides that the claims brought by the Plaintiffs are governed by English law, those Plaintiffs will still have available claims and remedies.

29.     I note that the essential factual allegations made against the Defendants in the Plaintiffs' claims in the U.S. Proceedings, as set out in the Class Action Complaint, are that although OnlyFans promotes itself as a social platform that allows Creators and users to develop personal, "*authentic relationships*", and represents to Fans that "*Subscribing to a Creator gives you exclusive access to private content being posted by that Creator and gives you access to be able to communicate with them directly via the direct messages interface (DM)*" (Class Action Complaint paragraphs 67-9), the true position (which is known to and facilitated by OnlyFans) is that many high-earning Content Creators do not operate their own OnlyFans accounts themselves and do not actually communicate with Fans (ibid paragraph 101).

30.     Based on these factual allegations the Plaintiffs' causes of action set out in the Class Action Complaint are:

> a.   Count I – this has two limbs: first, breach of the terms of the contract contained in the Terms of Service and related contractual documents (Class Action Complaint paragraphs 187-193 and 200), and secondly breach of a requirement not only to adhere to the express conditions in the contract, but

also to act in good faith when invested with a discretionary power over the other party (ibid, paragraph 194). No particular provisions of US law or state law are identified, although paragraph 194 refers in general terms to the "laws of the states where OnlyFans does business".

b. Count II – unjust enrichment (in the alternative to Count I) (ibid, paragraphs 201-212). No particular provisions of US law or state law are identified.

c. Count III - violation of the Illinois Consumer Fraud and Deceptive Business Practices Act through deceptive practices (ibid, paragraphs 213-226).

d. Count IV - violation of the Illinois Consumer Fraud and Deceptive Business Practices Act through unfair practices (ibid, paragraphs 227-244).

e. Count V - Illinois Common Law Fraud (ibid, paragraphs 245-256). No particular provisions of Illinois law are identified.

f. Count VI - violation of the New Jersey Consumer Fraud Act (ibid, paragraphs 257-269).

g. Count VII - New Jersey Common Law Fraud (ibid, paragraphs 270-280). No particular provisions of New Jersey law are identified.

h. Count VIII - New Jersey Negligent Misrepresentation (in the alternative to Count VII) (ibid, paragraphs 281-292). No particular provisions of New Jersey law are identified.

31.    The remedies sought by the Plaintiffs in the US Proceedings are damages, restitution of funds, injunctive relief (including enjoining Defendants from continuing the unlawful practices complained of), costs and interest.

32.    Should the English court decide that the claims brought by the Plaintiffs in Equivalent English Proceedings are governed by English law, the Plaintiffs will have available

claims and remedies which are broadly comparable to the causes of action advanced and the remedies sought in the US Proceedings.

33.     So far as Count I in the US Proceedings (breach of contract and breach of a requirement of good faith) is concerned, both limbs have English law equivalents.

34.     The first limb of Count I (breach of the contractual terms contained in the Terms of Service and related contractual documents) would be available as part of the English common law of contract if the conduct complained of amounted to a breach. Under English law principles of contractual interpretation, in order to decide whether the Plaintiffs' central allegation – that many high-earning Content Creators do not operate their own OnlyFans accounts themselves – amounts to a breach of the contractual terms agreed between the parties, two important principles would be relevant: (a) that in order to arrive at the true interpretation of a document, a clause must not be considered in isolation, but must be considered in the context of the whole of the document;[5] and (b) that in interpreting a contract all parts of it must be given effect where possible.[6] The application of these two principles of interpretation requires that particular attention is paid to a provision in a contract which specifically anticipates, and treats as permissible, conduct which one party subsequently seeks to characterise as a breach of the contract. In this regard I note that the Terms of Service specifically anticipate that a Creator may "*have an agent, agency, management company or*

---

[5] For a recent formulation of this principle see Carr J in ***EE Ltd v Mundio Mobile Ltd*** [2016] EWHC 531 (TCC) at [30]: "*Agreements should be read as a whole and construed so far as possible to avoid inconsistencies between different parts on the assumption that the parties had intended to express their intentions in a coherent and consistent way. One expects provisions to complement each other*", cited in the leading textbook Lewison on the Interpretation of Contracts, 7th edition, para 7.08.

[6] As Moore-Bick LJ explained in ***Dwr Cymru Cyfyngedig (Welsh Water) v Corus UK Ltd*** [2007] EWCA Civ 285 at [13]: "*Surplusage is by no means unknown in commercial contracts, of course, but it is unusual for parties to include in the operative part of a formal agreement of this kind a whole clause which is not intended to have contractual effect of any kind. One starts, therefore, from the presumption that it was intended to have some effect on the parties' rights and obligations*", cited in Lewison on the Interpretation of Contracts, 7th edition, para 7.25.

---

DECLARATION OF ANTONY WHITE KC IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

*other third party which assists with you the operation of your Creator account (or operates it on your behalf).*"

35.     Under English law the remedies available for breach of the express or implied terms of a contract, including an electronic commerce contract made between a consumer and an internet platform provider, include damages and (where appropriate) injunctive relief.

36.     The second limb of Count I (breach of a requirement not only to adhere to the express conditions in the contract, but also to act in good faith when invested with a discretionary power over the other party) is available as part of the English law of contract relating to consumers. The Supreme Court has recently confirmed that although English law has never recognised a general principle of good faith in contracting, it has developed "piecemeal solutions" in response to demonstrated problems of unfairness – see ***Times Travel (UK) Ltd v Pakistan International Airlines Corp*** [2023] AC 101 at [27]. One such piecemeal solution applies in the context of relational contracts where one party is vested with a discretionary power, exercise of which may impact on the other party – for example in employment contracts it is well established that if an employee bonus scheme gives the employer a very wide discretion as to the payment and size of bonus, this discretion must be exercised bona fide, rationally and not perversely. However, this requirement of good faith does not override express contractual provisions which set out the parties' anticipated manner of performance of their obligations.

37.     Another piecemeal solution – of particular relevance to the present case - resulted from the implementation in English law of a number of EU directives which required the introduction of a concept of good faith in relation to consumer contracts. As a result, good faith is a distinct element both in the general test of the fairness of contract terms in consumer contracts, and in the general test of the fairness of commercial practices by traders to

consumers. The UK law implementing these directives became part of "retained EU law" following Brexit.[7]

38.     So far as Count II in the US Proceedings (unjust enrichment) is concerned, the essential allegation is that the Plaintiffs conferred benefits on the Defendants (by making payments to them) which resulted from misrepresentations made by the Defendants and which it would be unjust for the Defendants to retain. I note this claim is made in the alternative to Count I, and there would seem to be a substantial overlap with Count I since the alleged misrepresentations are also relied on by the Plaintiffs as contractual terms. English law of unjust enrichment is highly developed, and it would be possible for the Plaintiffs to advance a claim for unjust enrichment in Equivalent English Proceedings. However, it is not apparent to me that there would be any advantage to doing so where on the facts alleged there appears to be a straightforward claim for breach of contract.

39.     So far as Count III in the US Proceedings (violation of the Illinois Consumer Fraud and Deceptive Business Practices Act  - the "ICFA" - through deceptive practices) is concerned, it appears from paragraphs 216-217 of the Class Action Complaint that the ICFA is a statute which protects consumers against unfair or deceptive acts or practices. As explained in paragraph [37] above there are comparable statutory protections for consumers under English law – in particular the Consumer Protection from Unfair Trading Regulations 2008 (which implemented the Unfair Commercial Practices Directive 2005) prohibit "unfair commercial

---

[7] In particular, the Consumer Protection from Unfair Trading Regulations 2008 (which implemented the Unfair Commercial Practices Directive 2005) prohibit "unfair commercial practices" of traders which are directly connected with the promotion, sale or supply of a "product" to or from consumers, whether occurring "before, during or after a commercial transaction". The 2008 Regulations impose a general test of unfairness, including that "[a] commercial practice is unfair if … it contravenes the requirements of professional diligence", where "professional diligence" is defined as "… the standard of special skill and care which a trader may reasonably be expected to exercise towards consumers which is commensurate with … the general principle of good faith in the trader's field of activity." This standard and its application to the behaviour of traders to consumers sets a general legal principle requiring fairness by traders in their behaviour to consumers.

practices" of traders which are directly connected with the promotion, sale or supply of a "product" to or from consumers, whether occurring "before, during or after a commercial transaction". Affected consumers can obtain redress for such unfair commercial practices.

40.   Count IV in the US Proceedings (violation of ICFA through unfair practices) seems to be closely related to Count III, and my observations in paragraph [39] above are repeated.

41.   Count V in the US Proceedings (Illinois Common Law Fraud) alleges that the Defendants made false representations to the Plaintiffs (Class Action Complaint paragraph 246), that these false representations were made knowingly or recklessly by the Defendants (ibid, paragraph 248), intending that the Plaintiffs should rely on them and knowing they were likely to do so (ibid, paragraphs 249, 250), and that the Plaintiffs did rely on the false representations, and thereby suffered damage (ibid, paragraphs 252, 254-5). If those alleged facts were established the Plaintiffs would be be able to pursue a claim under English law for fraudulent misrepresentation (or deceit) in the Equivalent English Proceedings. The available remedies would include damages and injunctive relief.

42.   Count VI in the US Proceedings (violation of the New Jersey Consumer Fraud Act – "NJCFA") repeats the factual allegations relied in support of Count V, and contends that these alleged facts amount to unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertising of merchandise, contrary to the NJCFA. As explained in paragraph [41] above, these alleged facts, if established, would provide the basis for a claim for fraudulent misrepresentation under English law in Equivalent English Proceedings. They would also provide the basis for a claim under the Consumer Protection from Unfair Trading Regulations 2008 referred to in paragraphs [37] and [39] above.

43.     Count VII in the US Proceedings (New Jersey Common Law Fraud) repeats in almost identical terms the factual allegations made in Count V. As explained in paragraph [41] above, these alleged facts, if established, would provide the basis for a claim for fraudulent misrepresentation under English law in Equivalent English Proceedings.

44.     Count VIII in the US Proceedings (New Jersey Negligent Misrepresentation) is advanced in the alternative to Count VII. It appears to rely on the same factual allegations as Count VII, with the exception that the false representations are said to have been made negligently rather than knowingly or recklessly (as is the case in Counts V and VII). Negligent misstatement is a cause of action under English law, and if the alleged facts were established it could be advanced by the Plaintiffs in Equivalent English Proceedings.

45.     A noteworthy feature of Counts III-VIII is that they all appear to proceed on the basis that the Plaintiffs' central allegation – that many high-earning Content Creators do not operate their own OnlyFans accounts themselves – amounted to conduct which the Defendants knowingly or recklessly or negligently misrepresented or concealed. In assessing that allegation in Equivalent English Proceedings an English court would have regard to what, if anything, was said about such conduct in the Terms of Service. As noted above, the Terms of Service specifically anticipate that a Creator may "*have an agent, agency, management company or other third party which assists with you the operation of your Creator account (or operates it on your behalf)*."

**The Courts of England Would Provide a Convenient Forum for the Efficient, Just and Expeditious Resolution of Such Similar Claims**

46.     The English courts would provide a convenient forum for the efficient, just and expeditious resolution of claims brought the Plaintiffs on the basis of the allegations made in the U.S. Proceedings.

47.     English courts have a strong and well-earned reputation for fairness in the resolution of disputes.

48.     The English courts have a great deal of experience with foreign litigants.

49.     Generally, in my experience, provided the claimant/s is determined to move forward without delay, cases in English courts proceed expeditiously toward a conclusion, usually reaching trial within 1-2 years of commencement.

50.     I have already referred above to the remedies that could be granted by the English courts, and confirm that these include damages and injunctive relief, the two remedies claimed by the Plaintiffs in the Class Action Complaint.

51.     I note that the Class Action Complaint contains a claim by the Plaintiffs on behalf of all members of a defined class and two sub-classes.  In English law there are various procedures analogous to a class action which the Plaintiffs could seek to deploy.  These include a Group Litigation Order under CPR 19.11, which allows a group of people who wish to bring claims that give rise to common or related issues of fact or law to apply to the court for a group litigation order to be made, providing for the claims to be managed together, usually by a single designated judge.  The group litigation order will establish a register of the claims included in the group, which is maintained by the claimants' lead solicitor.  The order may also make provision for how the litigation costs are to be shared among the claimants.  How the claims are managed is a matter for the designated judge, but procedures typically used are to select one or more claims to be tried as test claims while the remaining claims are stayed and to decide as preliminary issues common issues of law or fact which are potentially dispositive of the litigation.  Unless the court orders otherwise, a judgment given or order made in the litigation is binding on all the claimants included in the group register: see CPR r 19.12(1)(a).

52.     The collective procedural routes available to the Plaintiffs would also include a representative action under CPR 19.8 seeking declaratory relief to be followed by individual claims for compensation (see *Lloyd v Google LLC* [2022] AC 1217 at [47]-[48], [58], [81],

[84]), a representative action seeking a global award of damages for all members of the class (a so-called "top-down" award - see ***Lloyd*** (ibid) at [53]-[55], [82]-[86]), or a representative action for individual awards of damages provided these are of a uniform amount and do not require individual assessment (***Lloyd*** (ibid) at [82]).

53.     The English High Court has held that a representative claim may be pursued which seeks to recover for each class member a readily ascertainable sum which will be identifiable from the defendant's records, even if the sum in question differs from one class member to another. The case which establishes this - ***Commission Recovery Limited v Merks and Clerk LLP*** [2023] 2 All ER (Comm) 949 – concerned a representative claim to recover differing amounts of undisclosed commission payments unlawfully deducted from moneys due to members of the claimant class, where the amounts deducted in relation to a particular class member would be ascertainable from the defendant's records. There is no reason why the same approach could not be taken to the present claim – the amounts paid by the Plaintiffs and each class member would presumably be ascertainable from the Defendants' records of an individual's transaction history if liability is established.

54.     I have noted above that the Plaintiffs' claim for injunctive relief in the US Proceedings includes enjoining Defendants from continuing the unlawful practices complained of. The wide jurisdiction of the English High Court to grant declaratory and injunctive relief enables it to grant comparable relief.

55.     The jurisdiction of the English High Court to grant declaratory relief is derived from statute, originally the Court of Chancery Act 1850, then section 50 of the Chancery Procedure Act 1852. The present statutory foundation is section 19 of the Senior Courts Act 1981, read together with CPR Part 40.20. The modern practice is to regard the availability of declaratory relief as a beneficial, discretionary and flexible remedy. The English High Court is particularly willing to grant appropriate declaratory relief where there is a 'test case', or it may

affect a significant number of other cases, and it is in the public interest to decide the issue concerned.

56.     The jurisdiction of the English High Court to grant injunctive relief is also conferred by statute in section 37 of the Senior Courts Act 1981, and is in the widest terms. Section 37(1) states that: "*The High Court may by order (whether interlocutory or final) grant an injunction ... in all cases in which it appears to the court to be just and convenient to do so*." The width of this jurisdiction has been repeatedly emphasised by the highest English courts. In a recent authoritative review of the law and practice in this area in ***Convoy Collateral Ltd v Broad Ideas International*** [2023] AC 389, Lord Leggatt at [57] approved the following statement of principle: "*The powers of courts with equitable jurisdiction to grant injunctions are, subject to any relevant statutory restrictions, unlimited. Injunctions are granted only when to do so accords with equitable principles, but this restriction involves, not a defect of powers, but an adoption of doctrines and practices that change in their application from time to time*". Lord Leggatt described the correctness of this statement of principle as "*settled*" at [58]. The judgment of Lord Leggatt also makes the important point at [28] that the claim before the English court in respect of which an injunction is sought does not have to arise under English law (as opposed to foreign law), it only has to be one which the English court regards as legally sustainable.

57.     These wide powers to grant declaratory and injunctive relief would enable the English High Court to grant a declaration that it would be unlawful for the Defendants to continue to offer services to Fans on the OnlyFans website in the manner complained of by the Plaintiffs.

58.     It is thus my opinion that English courts would provide a fair, impartial, efficient, and, given the underlying facts alleged by the Plaintiffs in this matter, convenient forum for the resolution of this dispute, particularly given the parties' choice of forum.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 18th day of December, 2023, in London, England.

_Antony White_       December 18, 2023
_____

Antony White KC

**Exhibit A**



**24 HOUR ASSISTANCE**
+44 (0)20 7404 3447



Called: 1983

|

Silk: 2001

|

Called (Northern Ireland): 2016

> "Antony is practical and authoritative."
>
> CHAMBERS & PARTNERS 2023

**MAIN AREAS OF PRACTICE**

International Arbitration

Commercial Law

Civil Liberties and Human Rights

Media and Information Law

Data Protection

Defamation and Privacy

Private International Law

Public International Law

Public Law

Commercial Public Law

# ANTONY WHITE KC

Contact Antony: antonywhite@matrixlaw.co.uk | +44 (0)20 7404 3447

Contact Antony's Practice Team (Team X): TeamX@matrixlaw.co.uk

Antony's principal areas of practice are media and information law with a particular emphasis on privacy and data protection, and commercial law and arbitration.

Antony combines an intellectual approach with a relaxed and user-friendly manner.

## Media and Information Law

A leading silk in the area of media and information law, Antony has particular expertise in privacy and data protection, and also handles defamation and breach of confidence cases. He is regularly instructed in cutting edge cases in this area by tech companies, print and online publishers, broadcasters and other media organisations.

## Commercial Law

In the commercial field, his most recent cases have included commercial confidentiality, tech industry disputes, fraud and asset tracing, conflicts of laws and jurisdiction, commercial agency, foreign government guarantees, and an increasing number of heavy international arbitrations.

## Publications

Contributor to Information Rights, Ed. Coppel, Fifth Edn (Hart, 2020)

Privacy and Trade Unions sections, Bullen & Leake & Jacobs Precedents of Pleadings, 19th edition (Sweet and Maxwell, 2019)

Administrative Law chapter of Civil Appeals edited by Sir Michael Burton, 2nd edn (2013)

Co-author, Privacy and The Media – The Developing Law (Matrix, 2002)

Contributor to The Freedom of Information Handbook, Ed. Carey

Contributor to Enforcing Contracts in Transition Economies (EBRD/BIICL, 2005)

### Antony's Privacy Notice

*Antony is committed to protecting and respecting individual's privacy where and to the extent appropriate. In order to provide legal services to his clients, including advice, drafting and representation services, Antony needs to collect and hold personal data. This includes his client's personal data and the personal data of others who feature in the disputes and other matters upon which he is instructed. To read Antony's privacy notice in full, please see here.*

## DIRECTORY RECOMMENDATIONS

*"His written and oral advocacy are absolutely first rate - he is calm, measured, and analytically and intellectually incisive, yet has an easily accessible and persuasive style."*

**Legal 500, 2024, Commercial Litigation**

*"He is calm, measured, analytical, intellectually incisive, and has an accessible and persuasive style."*

**Legal 500, 2024, Data Protection**

*"He's the kind of barrister you're lucky to get on your case; he works in all the big cases in the area. He's polite, decisive, realistic and an extremely strong advocate." "He's extremely calm, ordered and very easy to work with. He is incredibly sharp, knows the law inside out and has very good judgement in terms of how to present arguments." "His intellect is terrifying and his advocacy is unrivalled. He is a brilliant all-round lawyer." "He's strong across the board."*

**Chambers & Partners, 2024, Data Protection**

*"He is the one to instruct. His written advice is incredibly clear and he is very good in court." "His advice is mesmerising." "His intellect is terrifying, advocacy is unrivalled, he is a brilliant all-round lawyer. He is great."*

**Chambers & Partners, 2024, Defamation & Privacy**

"A fantastic advocate." "Antony White is extremely personable and persuasive - a very skilled advocate."

*Chambers & Partners, 2024, Group Litigation*

"Antony is practical and authoritative."

*Chambers & Partners, 2023, Defamation & Privacy*

"Antony is super smart and very good at taking apart the other side on cross-examination in a quiet and very forensic way." "He has encyclopaedic knowledge of the law and is a joy to work with."

*Chambers & Partners, 2023, Group Litigation*

"He has exceptional experience of privacy and data security litigation cases, and has a detailed understanding of the underlying commercial and technological issues."

*Chambers & Partners, 2023, Commercial Litigation*

"Antony is absolutely brilliant to work with and is excellent. He's super for data protection matters and is really highly thought of." "Antony cannot be faulted in any area. He is a very strong senior counsel across the board in this practice area."

*Chambers & Partners, 2023, Data Protection*

"Very strong data privacy lawyer, very much at the top of this field."

*Legal 500, 2023, Data Protection*

"Antony is the doyen of complex defamation and privacy matters. His encyclopaedic knowledge of fraud is an essential ingredient for picking him in the high profile difficult matters in defamation, data protection and privacy matters. He is exceptional and a pleasure to deal with."

*Legal 500, 2023, Defamation & Privacy*

"Fabulous on strategy and tactics; a great advocate; delightful to work with."

*Legal 500, 2023, Group Litigation*

"Extremely calm, user-friendly, insightful, knowledgeable and commercial in his advice. An excellent all-round advocate and strategist."

*Legal 500, 2023, Media and Entertainment*

"He is an excellent advocate, has a very good feel for judges and is trusted by courts. He is very easy to work with. A real team player. Straightforward. Diligent."

*Legal 500, 2023, Commercial Litigation*

"He is a very talented advocate and a fantastic practitioner in the area." "He is hugely experienced and has great gravitas."

*Chambers & Partners, 2022, Group Litigation*

"An excellent advocate, who is very succinct and very straightforward in his submissions. Antony is trusted by judges and has a good feel for cases and how tribunals might be thinking. He also understands how to work in a team."

*Chambers & Partners, 2022, Commercial Dispute Resolution*

"He is the best on complex media and data protection disputes." "He's very client-friendly, has a great manner and is a really great advocate." "He's superb: he has encyclopaedic knowledge of privacy and data protection but at the same time is able to approach problems from a pragmatic perspective."

*Chambers & Partners, 2022, Data Protection*

"The very best QC for data privacy work. He's doing all the leading cases and is a dream to work with."

*Legal 500, 2022, Data Protection*

"Antony is a very strong advocate, very clear in his advice and very personable."

*Legal 500, 2022, Defamation & Privacy*

"Antony is just the best of the best. His knowledge of data protection law is incredible and he has been involved in many of the cutting edge media cases of recent years. You really cannot go wrong working with Antony."

*Legal 2022, Media and Entertainment (Including Art and Cultural Property)*

"Very intelligent, strategic, easy to work with, good with clients and crisp and authoritative in advocacy. A gem."

*Legal 500, 2022, Commercial Litigation*

"Extraordinarily clever and knows how to deliver difficult messages in exactly the right way."

"There are a number of barristers specialising in traditional media torts, and there are now a number of data protection specialists, too. However, there are not many who are genuinely expert in both fields. Antony White QC is one."

"Exceptional on all fronts, an excellent advocate in the courtroom but equally skilled at providing clear advice to clients on complex areas of law."

"A superb forensic advocate and a great team player."

"Incredibly persuasive, great at winning clients' trust and brilliant in Court."

"One of the best all-round barristers."

"First class in terms of service, and on-point and concise in his legal analysis."

*"An extraordinary talent with an incredible brain."*

*"A strategic thinker of the highest calibre."*

*"Manages to make complex matters simple and knows the various legal regimes like the back of his hand." "He is great at finding the way forward in very difficult cases."*

*"He is fantastically bright and a pleasure to work with."*

*"A very likeable, modern and easy to use silk."*

*"Antony is a strategic thinker of the highest calibre. Excellent on his feet, he is also user-friendly."*

*"He just gets it – he is a genius and very thoughtful."*

*"He's wonderful, a truly gifted advocate and a complete delight."*

*"Really unbelievably intelligent."*

*"He provides extremely clever arguments and unique viewpoints on cutting-edge cases."*

Please consider the environment and only print this material if you absolutely need to. Please dispose of this material responsibly.